670 F.2d 215
 216 U.S.App.D.C. 57, 7 Media L. Rep. 2313
 RKO GENERAL, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Multi-State Communications, Inc., Intervenor.
RKO GENERAL, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Fidelity Television, Inc.,
Multi-State Communications, Inc., Intervenors.
RKO GENERAL, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Fidelity Television, Inc., New England Television
Corporation, Dudley Station Corporation,
Multi-State Communications, Inc.,
Community Broadcasting of
Boston, Inc., Intervenors.
 Nos. 80-1696 to 80-1698.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 16, 1981.
Decided Dec. 4, 1981.
 
 Appeals from Orders of the Federal Communications Commission.
 J. Roger Wollenberg, Washington, D. C., with whom Joel Rosenbloom, A. Douglas Melamed, Barbara S. Wellbery, Bruce D. Ryan, W. Theodore Pierson, Harold David Cohen, William H. Fitz, Jack N. Goodman, Washington, D. C., and William E. Willis, New York City, were on the brief, for appellant.
 L. Andrew Tollin, Counsel, F.C.C., Washington, D. C., with whom Marjorie S. Reed, Acting Gen. Counsel, David J. Saylor, Deputy Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Lee J. Peltzman, Sue Ann Preskill and Linda L. Oliver, Counsel, F.C.C., Washington, D. C., were on the brief, for appellee.
 Eugene F. Mullin, Washington, D. C., with whom B. Shelby Baetz, Nathaniel F. Emmons and Howard A. Topel, Washington, D. C., were on the brief, for intervenor, Fidelity Television, Inc., in Nos. 80-1697 and 80-1698.
 Joseph M. Morrissey, Washington, D. C., was on the brief, for intervenor, Multi-State Communications, Inc., in Nos. 80-1696, 80-1697 and 80-1698.
 Philip Elman, Terry F. Lenzner, James H. Davis, Joseph F. Hennessey, Edward Hayes, Jr., and Jay E. Ricks, Washington, D. C., were on the joint brief, for intervenors, New England Television Corporation, et al., in No. 80-1698.
 Before TAMM, MIKVA and EDWARDS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 The Federal Communications Commission (FCC) denied renewal of television licenses to RKO General, Inc. (RKO) in Boston, Los Angeles, and New York City. Renewal of the Boston license was denied because of a finding that RKO lacked the requisite character to be a licensee of that station. The denial of license renewals in Los Angeles and New York City followed from the Commission's earlier determination that the Boston finding would be res judicata in those proceedings.
 RKO is a wholly owned subsidiary of General Tire & Rubber Company (General Tire).[1] General Tire, by its own admission, has engaged in a staggering variety of corporate misconduct. During the Boston proceeding, RKO withheld evidence of General Tire's conduct from the FCC, either because RKO sought to protect its parent or because the parent withheld information from the subsidiary in order to protect itself. The Commission, in turn, has disqualified RKO after years of delay in an opinion that is multifarious at best. We reject most of the grounds that the FCC used to justify its denial of RKO's license renewals. We affirm the Commission's decision that RKO lacked candor, but on a quite narrow ground that cannot automatically be applied to any other proceeding. Accordingly, although we uphold denial of the Boston license renewal, the proceedings in Los Angeles and New York City must be remanded.
 
 
 1
 The need for a remand and further action by the Commission is discomfiting in a fifteen-year-old case, but this extended proceeding has hardly been a model for the administrative process. We admonish all parties to get on with the task.
 
 I. PROCEDURAL HISTORY
 
 2
 Extraordinary as it may seem, this case had its beginning in 1965, when RKO petitioned to renew its license for KHJ-TV in Los Angeles. The petition was opposed by a competing applicant on a variety of grounds, including the allegation that RKO had engaged in reciprocal trade practices.[2] A comparative hearing on the two applications led to a Commission finding in 1973 in favor of RKO,[3] subject to further findings on the reciprocity issue[4] in the Boston proceeding discussed below. A fuller history of these events may be found in Fidelity Television, Inc. v. FCC, 515 F.2d 684 (D.C.Cir.), cert. denied, 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975), which affirmed the Commission's decision.
 
 
 3
 In the meantime, other competing applicants had challenged RKO's license renewal application for WNAC-TV in Boston. RKO General, Inc. (WNAC), 20 F.C.C.2d 846 (1969). The FCC also designated a reciprocity issue in the Boston proceeding, and authorized that official notice be taken of the KHJ-TV record. Similarly, when RKO sought renewal of WOR-TV in New York City in 1974, the FCC determined that RKO's application would be bound by the record in the Boston proceeding then underway.[5]
 
 
 4
 With renewals in New York and Los Angeles conditioned upon its outcome, the Boston proceeding took on special importance. An Administrative Law Judge issued an initial decision in that proceeding on June 21, 1974, granting renewal to RKO despite affirmative findings as to RKO's reciprocal trade practices.[6] Exceptions and reply pleadings were then filed before the Commission in response to that initial decision. Before the FCC could act on these administrative appeals, however, RKO's parent corporation found itself enmeshed in an investigation by the Securities and Exchange Commission (SEC) that would greatly impact RKO's petitions to the FCC.
 
 
 5
 In a series of civil actions brought in 1974 and 1975, the SEC had charged that questionable domestic and foreign payments by American corporations and falsification of corporate financial records to conceal such payments violated the federal securities laws.[7] One of the SEC's targets was General Tire, and RKO's competing applicants in the Boston proceeding sought to take advantage of that fact. On December 10, 1975, Community Broadcasting of Boston, Inc. (Community) filed a petition to reopen the record for a hearing on "illegal and improper conduct" by General Tire in the United States and foreign countries, including bribery of officials, creation of secret accounts, misappropriation of foreign corporate funds, and deliberate concealment of these matters by General Tire and RKO.[8]
 
 
 6
 RKO opposed this move in a series of pleadings. On January 21, 1976, it urged that there was "no factual or legal foundation" for these charges.[9] In June 1977, well after the SEC had filed a complaint and obtained a consent decree against General Tire,[10] RKO continued to oppose the petition to reopen the record in oral argument before the Commission.[11] The consent decree required General Tire to conduct a review of its operations and prepare a Special Report, however. This report, which was released on July 1, 1977,[12] admitted a plethora of corporate misconduct, and documented inadequacies in RKO records for certain reports previously filed with the FCC. Nevertheless, RKO continued to oppose the need for further proceedings, claiming that all "essential facts" concerning its operation of WNAC were before the Commission, and that because resolution of Community's claims "turns on inferences and legal conclusions to be drawn from those facts, the Commission would be well within its authority in deciding this case without holding a further evidentiary hearing."[13]
 
 
 7
 For reasons that may be partially attributable to strategic maneuvering among two of the many RKO competitors,[14] the FCC did not act on Community's petition to reopen the Boston proceeding until June 21, 1979. A week later, the Commission directed the parties to file summaries of their positions and present oral argument on the following questions:[15]
 
 
 8
 (1) Is the record in this proceeding sufficient for the Commission to make a judgment:
 
 
 9
 (a) that RKO is qualified to remain the licensee of Station WNAC-TV, Boston, Massachusetts; or
 
 
 10
 (b) that RKO is not qualified to remain the licensee of Station WNAC-TV, Boston, Massachusetts?
 
 
 11
 (2) In the event that the record is sufficient to make either of the above judgments, what should that judgment be?
 
 
 12
 Oral argument was held before the Commission en banc shortly thereafter. The FCC concluded that it could answer the first question: RKO could not be found qualified to remain a licensee on the existing record. It decided to seek further information before answering the other questions, however.[16] Two days later, the FCC reopened the record to accept the Special Report into evidence, and urged that RKO "make a particularized proffer of specific evidence that it would introduce, if given the opportunity, to mitigate the findings" of that report.[17] RKO proffered evidence and affidavits in September 1979. RKO also now contended that it deserved additional hearings before the Commission could find it not qualified.[18]
 
 
 13
 On June 6, 1980, the FCC issued three companion orders resolving the WNAC proceeding and the two other license renewals that had been conditioned upon it.[19] The WNAC decision (Decision) focused on four specific areas of misconduct by RKO and General Tire: reciprocal trade practices by RKO and General Tire during the 1960s, id. at PP 58-92; General Tire's misconduct in a variety of nonbroadcast fields, id. at PP 93-162; inaccurate financial reports filed by RKO with the FCC, id. at PP 163-195; and RKO's general lack of candor during the course of the Boston proceeding, id. at PP 196-221. The Decision concluded that nothing in RKO's broadcast history mitigated these findings, id. at PP 222-32, and that absolute disqualification of RKO as a broadcast licensee was the only appropriate remedy, id. at PP 233-49. The companion orders accordingly disqualified RKO as a licensee of WOR-TV (New York) and KHJ-TV (Los Angeles).
 
 
 14
 Of the four grounds for disqualification, only reciprocal practices had been the subject of formal notice and hearing before an Administrative Law Judge. The FCC's findings as to General Tire's nonbroadcast misconduct and RKO's financial misrepresentations relied heavily on the Special Report. The findings concerning RKO's lack of candor rested on RKO's failure to make timely submission of the information contained in the Special Report, as reflected by RKO's earlier pleadings before the Commission. On each of these three points, the Decision rejected RKO's argument that it could not be disqualified without formal notice and hearing. Id. at PP 144-61 (General Tire's nonbroadcast misconduct); id. at PP 193-95 (financial inaccuracies); id. at PP 219-221 (lack of candor).
 
 
 15
 RKO appealed from all three orders denying license renewal, and the appeals were consolidated by this court.
 
 II. INVALID BASES OF THE FCC DECISION
 
 16
 At the outset, we hold that the FCC has stated at least three independent grounds for its ultimate finding that RKO should be disqualified as a broadcast licensee in Boston.[20] The Decision states that RKO's reciprocal dealings "alone" require disqualification, id. at P 92, that RKO's "willful and repeated (financial) misrepresentation warrants disqualification by itself," id. at P 164, and that "perhaps of greatest importance, RKO has demonstrated a persistent lack of candor with the Commission in these proceedings," id. at P 55(a). Our conclusion also follows from the structure and organization of the FCC Decision, which distinctly sets out findings of fact for each of these grounds and treats each of them as entirely separate. We must note that the FCC continues to struggle with the difficult art of drafting its opinions. In Leflore Broadcasting Co. v. FCC, 636 F.2d 454 (D.C.Cir.1980), for example, we emphasized that the Commission has some burden to express the basis for its actions carefully:
 
 
 17
 Where several violations are found, the Commission should set forth the role each plays in the assessment of penalty. Rarely should the agency be permitted to take a "gestalt" approach, one based upon a reaction to the "overall" situation rather than to each violation one at a time.
 
 
 18
 Id. at 463. Nevertheless, although we may not supply a reasoned basis for agency action that the agency itself has not given, courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 442-43, 42 L.Ed.2d 447 (1974); WAIT Radio v. FCC, 418 F.2d 1153, 1156 (D.C.Cir.1969), cert. denied, 409 U.S. 1027, 93 S.Ct. 461, 34 L.Ed.2d 321 (1972). A fair reading of the Decision compels the conclusion that these three grounds are independent, and that in the FCC's view each one by itself required the disqualification of RKO as a licensee.[21]
 
 
 19
 This preliminary observation is important because we have grave doubts about the sufficiency of two of these grounds to support the FCC's action. The Commission's findings on reciprocal trading display a disconcerting willingness to judge the behavior of broadcast applicants by standards that had not been clearly enunciated when that behavior occurred. The finding that RKO knowingly submitted inaccurate financial reports and thereby intended to mislead the Commission raises extremely troublesome questions because of the FCC's failure to give RKO notice and a hearing on that issue. Moreover, we agree with the Commission that General Tire's nonbroadcast practices, the fourth focus of the FCC Decision, are "not disqualifying by themselves." Decision P 140. The remand on the other two license renewals is occasioned at least in part by the rejection of these decisional grounds, to whose inadequacies we now turn.
 
 A. Reciprocal Trade Practices
 
 20
 There are several reasons to doubt that reciprocal trade practices during the early 1960s can justify outright disqualification of RKO as a broadcast licensee in 1980. First and foremost, the conduct of RKO at issue has been found to be clearly improper only in retrospect. Although it has been understood since the 1930s that "coercive" reciprocity was anticompetitive,[22] it was not until the late 1960s that a series of judicial decisions began to cast increasing doubt on the legality and propriety of unleveraged "mutual patronage" agreements.[23] Even then, however, questions remained.[24] As late as 1979, the FCC itself recognized that a per se rule was probably inappropriate because "it is still somewhat uncertain whether a non-coercive unleveraged reciprocal agreement ... necessarily and in every case is anticompetitive and a Sherman § 1 violation." Domestic Public Message Services, 73 F.C.C.2d 151, 161 (1979). As a result, although we are not in absolute agreement with RKO that the challenged conduct was "undertaken in good faith,"[25] the FCC's conclusion rests not on a fair reading of the contemporaneous law but upon a "greater appreciation now for the adverse impact of reciprocal trade practices on the broadcast industry and thus on the public interest." Decision P 86 n.156. The FCC unquestionably has the authority and even the duty to change its mind as to the degree of anticompetitive practices that are not in the public interest. Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Such a finding may not be applied retroactively, however, to conduct that ceased almost fifteen years ago. Securities Exchange Commission v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).[26]
 
 
 21
 We are particularly concerned that in retroactively applying its "greater appreciation" for the adverse effects of reciprocal trading, the FCC has abruptly reversed its decision to the contrary in RKO General, Inc. (KHJ-TV ), 44 F.C.C.2d 149 (1969), aff'd sub nom. Fidelity Television, Inc. v. FCC, 515 F.2d 684. That case held that essentially the same conduct was neither disqualifying nor ground even for a comparative demerit.[27] Failure to explain the reversal of directly controlling precedent is unlawful. See, e.g., Columbia Broadcasting System, Inc. v. FCC, 454 F.2d 1018, 1026 (D.C.Cir.1971); Melody Music, Inc. v. FCC, 345 F.2d 730, 732 (D.C.Cir.1965). "Although an administrative agency is not bound to rigid adherence to its precedents, it is equally essential that when it decides to reverse its course, it must give notice that the standard is being changed ... and apply the changed standard only to those actions taken by parties after the new standard has been proclaimed as in effect." Boston Edison Co. v. FPC, 557 F.2d 845, 849 (D.C.Cir.), cert. denied sub nom. Towns of Norwood, Concord and Wellesley, Mass. v. Boston Edison Co., 434 U.S. 956, 98 S.Ct. 482, 54 L.Ed.2d 314 (1977). Although the FCC conditioned its first decision on RKO's reciprocal dealings on the possibility that significant new evidence might be introduced in the subsequent WNAC proceeding, such evidence never appeared. Additional evidence of reciprocal trading was heard in that second proceeding, but the bulk related to nonbroadcast activities by General Tire rather than RKO, and the remainder was merely cumulative of evidence in the first proceeding.[28]
 
 
 22
 Finally, we doubt the Commission's claim that it can predict RKO's future character and performance from evidence concerning conduct that took place between 1961 and 1964.[29] Only the unusual nature of these proceedings allows the FCC to argue that such evidence is at all relevant. FCC precedents consider a licensee's behavior during the preceding license term relevant to renewal requests for the following term. Central Florida Enterprises, Inc. v. FCC, 598 F.2d 37, 43 (D.C.Cir.1978), cert. dismissed, 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979); Citizens Communications Center v. FCC, 447 F.2d 1201, 1208 (D.C.Cir.1971). RKO sought renewal of WNAC for the 1969-1972 term, and the FCC has failed to allege acts of reciprocity during the earlier term from 1966 to 1969. But RKO's renewal application for KHJ concerned the 1965-1968 term, thereby giving the FCC an excuse for claiming that conduct from 1962 to 1965 "is precisely the conduct at issue." Brief for Appellee FCC (FCC Brief) at 36 n.59. Even so, the FCC acknowledges that the recency of misconduct is an important factor for purposes of character evaluation. Decision P 55(c); see Miami Valley Broadcasting Corp., 78 F.C.C.2d 684, 738-39 (1980). The Commission has not paid sufficient heed to that principle here.
 
 
 23
 Nothing in our opinion diminishes the force of the FCC's now clear statement that reciprocity by broadcast licensees is a prohibited practice. The Commission has laid down the rule that those who induce others to advertise on their stations for reasons unrelated to the station's programming or audience will do so at their peril. We agree that the purposes of the Communications Act are best served by leaving stations to obtain advertising and customers on the basis of their rates and audience, and that even unleveraged reciprocal trading distorts the normal free market process in the broadcast industry by which the demand for advertising time helps ensure that radio and television programming is responsive to public desires. See Decision PP 66-74. Competition in the broadcast industry means that a broadcaster should "survive or succumb according to his ability to make his programs attractive to the public," FCC v. Sanders Bros., 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940), and reciprocity injects an extrinsic factor that breaks the link between program quality and revenues. This rule has now been articulated forcefully, and future violations should be treated with the firmness expressed by the FCC in this case. Nevertheless, this ground cannot justify disqualification of RKO for nonleveraged, mutual patronage agreements during the early 1960s.
 
 B. Financial Misrepresentations
 
 24
 The Commission's finding that RKO submitted intentionally false financial reports is equally insufficient to support RKO's disqualification. The Decision states that "RKO knowingly certified to the Commission that certain financial reports were complete and accurate when RKO knew otherwise." Id. at P 164. The FCC's conclusion presumes that RKO's inaccuracies were either deliberate and intentionally deceptive, Big Valley Cablevision, Inc., 75 F.C.C.2d 702, 714 (1980); Kaye-Smith Enterprises, 71 F.C.C.2d 1402, 1415 (1979), or that RKO's reports were made with such "wanton, gross, and callous" disregard for their truth as to reflect the equivalent of such an "affirmative and deliberate intent." Golden Broadcasting Systems, Inc., 68 F.C.C.2d 1099, 1106 (1978); see Leflore Broadcasting Co. v. FCC, 636 F.2d at 462. Despite the fact that RKO had consistently denied acting with such intent or disregard, the FCC brushed aside proffered RKO affidavits to that effect and drew adverse inferences without allowing RKO to defend itself in a hearing. Such a procedure was not lawful.
 
 
 25
 The FCC justifies its finding on the basis of the Special Report, which included numerous corporate admissions that RKO's recordkeeping had been sloppy and inaccurate. Specifically, General Tire conceded in the Special Report that RKO's accounting for trades and barters[30] had been incomplete for the previous five years. The FCC seized on the repeated attempts by RKO's controller to improve the recording of such information to infer that he "had to know that RKO's barter information was inaccurate" as early as 1972. Decision P 179. This inference was unwarranted. RKO's objections to such summary factfinding are well taken, because the admitted inaccuracy of the reports still left issues as to RKO's motive and intent that could only have been determined in what the FCC itself has called "the crucible of an evidentiary hearing." Walton Broadcasting, Inc., 78 F.C.C.2d 857, 877 (1980). It is absurd to claim that "RKO's underlying motives were not decisionally significant, and thus any supposed factual issue as to motivation was immaterial," FCC Brief at 111, when the issue is not whether the reports were inaccurate but whether they were knowingly so. Given RKO's sworn statements that it made no willful misrepresentations, it was error to deny RKO the timely opportunity to present live witness testimony with the bald statement that RKO's affidavits were "not credible." Decision P 182. The FCC's finding turned on RKO's intent, "and thus demands that the decision-maker weigh witness credibility." Nasem v. Brown, 595 F.2d 801, 807 (D.C.Cir.1979). Moreover, had the FCC formally designated this charge and given RKO a hearing in which to rebut it, the Commission would have had the opportunity to explore what possible reason RKO might have had for intentionally misreporting information that is apparently considered of minor significance by the FCC itself.[31]
 
 
 26
 The Special Report does demonstrate a pervasive failure to maintain adequate records at RKO stations, a failure that does nothing to recommend RKO as a broadcast licensee. But it is a far leap from this to the finding that RKO intentionally or knowingly misrepresented financial information to the Commission. Section 309 of the Communications Act, 47 U.S.C. § 309(e) (1976), requires the Commission to hold a hearing in cases where "a substantial and material question of fact is presented," and to specify "with particularity the matters and things in issue but not including issues or requirements phrased generally." Whether RKO submitted inaccurate reports knowingly and with intent to mislead the Commission remains an unresolved and material question of fact, and it was therefore error for the Commission to disqualify RKO without following the procedures outlined by the statute.[32]
 
 C. General Tire's Nonbroadcast Misconduct
 
 27
 The FCC found it unnecessary to reach the question of whether RKO would have been disqualified had the only adverse character evidence been that relating to General Tire's nonbroadcast misconduct. Decision P 140. Instead, the Commission found that General Tire's misconduct had "an adverse effect on RKO's qualifications" and lent "substantial weight" to the Commission's decision to disqualify RKO on each of the other grounds. Id. at PP 93, 140. We find nothing unlawful in this approach, although it raises other questions.
 
 
 28
 As General Tire's own admissions in the Special Report illustrate, its conduct in nonbroadcast fields hardly enhances RKO's character assessment. General Tire's misconduct, ranging from bribery and fraud abroad to the maintenance of secret cash funds for political contributions at home, inevitably casts a shadow on the character of its wholly owned subsidiary. We have no reason to doubt that "General Tire is institutionally inclined to sacrifice obedience to law and proper business ethics in pursuit of corporate revenue and political influence." Decision P 2(f). Were RKO's owner a single individual as opposed to a corporation, it appears that a far lesser showing of character flaws would support disqualification. See, e.g., Wadeco, Inc. v. FCC, 628 F.2d 122, 128 (D.C.Cir.1980); Star Stations of Indiana, Inc., 51 F.C.C.2d 95 (1975). For reasons that are far from clear, however, the FCC seems to distinguish between misconduct by individual owners and misconduct by corporate entities. See, e.g., Katy Communications, Inc., 87 F.C.C.2d 764, 766-67 (1981); Southern Bell Telephone and Telegraph Co., 82 F.C.C.2d 322, 327 (1980); Cowles Florida Broadcasting, Inc., 60 F.C.C.2d 372, 406 (1976), rev'd on other grounds sub nom. Central Florida Enterprises, Inc. v. FCC, 598 F.2d 37 (D.C.Cir.1978), cert. dismissed, 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979); Kaiser Broadcasting Corp., 46 F.C.C.2d 589, 598 (1974).
 
 
 29
 It is difficult to discern any legitimacy for such differential treatment of individual as opposed to corporate owners.[33] It is to be hoped that pending FCC efforts to clarify the character standards to be applied in comparative hearings will cast more light on this point. See Policy Regarding Character Qualifications in Broadcast Licensing: Notice of Inquiry, 87 F.C.C.2d 836 (1981). In any event, the FCC has not tried in this appeal to increase the significance attached to corporate misconduct in nonbroadcast areas, see FCC Brief at 92 n.207, 132, nor could it have done so without first serving notice that its policy had changed. See Doubleday Broadcasting Co. v. FCC, 655 F.2d 417, 423 (D.C.Cir.1981) ("The Commission may not decide a case one way today and a substantially similar one another way tomorrow, without a more reasonable explanation than is offered here."). The nonbroadcast misconduct of General Tire, egregious as it has been, has small practical significance in the FCC's decision to disqualify RKO. The importance of this corporate misconduct has not been inflated, and although the Commission appropriately weighed it against RKO, that misconduct has not been offered as a foundation for the denial of RKO's license renewals.[34]
 
 
 30
 In short, three of the four areas on which the FCC focused in its Decision will not serve as a basis for RKO's outright disqualification, at least on this record. It is not necessary to underscore our criticism too pointedly, however. We uphold the Commission's disqualification of RKO in the Boston proceeding because we conclude that the Decision's ultimate basis, RKO's lack of candor before the FCC, fully and independently supports that judgment.
 
 III. RKO'S LACK OF CANDOR
 
 31
 The Commission found that three instances demonstrated RKO's lack of candor before the agency during a period from 1975 to 1977. First, RKO failed to inform the FCC that there was a factual basis to the allegations first made against General Tire by Community in late 1975. Decision PP 197-205. Second, RKO failed to report the initiation of a formal SEC investigation of General Tire in February 1976. Id. at PP 206-12. Finally, RKO failed to concede that it had inaccurately reported trade and barter revenues when pressed to do so by Community in April 1977, despite the indication in General Tire's 1976 Annual Report that there might be some problems with these accounts. Id. at PP 213-18.
 
 A. The Merits of the FCC's Finding
 
 32
 The record fully supports the Commission's finding that RKO did not display full candor before the Commission during the period from late 1975 to July 1976. Uncontroverted documentary evidence shows that General Tire responded to the initial phase of the SEC's inquiry regarding overseas operations in May 1975. Special Report at 30, J.A. 1270. As the SEC investigation progressed, RKO's competitors began pressing the FCC to reopen the Boston proceeding, alleging facts that were similar or identical to the admissions later made by General Tire in the consent decree and its Special Report.[35] RKO's first response was to seek an extension of time in which to respond, citing the need to consult with "persons who may have knowledge of the pertinent facts." RKO Motion for Extension of Time, December 12, 1975, J.A. 582-83. More than a month later, in January 1976, RKO clearly decided to stonewall the opposition and the FCC. This seems the only explanation for RKO's decision to file a document opposing the suggestion that the Boston proceeding be reopened on the ground that "there is no factual or legal foundation for this pyramid of charges," that "the charges, as we show below, are groundless," and that other charges were "essentially unsupported."[36]
 
 
 33
 RKO contends that these statements were technically correct.[37] Brief for Appellant RKO (RKO Brief) at 33. It adds that because the burden lay on Community to establish grounds for reopening the proceeding,[38] RKO's pleadings "in context" merely claimed that this burden had not been met. Both arguments are irrelevant, because the question before the FCC was not so much what RKO said as what it had failed to say.
 
 
 34
 Section 1.65 of the Commission's Rules requires applicants to inform the Commission within thirty days whenever "there has been a substantial change" regarding any matter that may be "of decisional significance in a Commission proceeding involving the pending application." 47 C.F.R. § 1.65 (1979). This requires that an applicant inform the Commission "of all facts, whether requested in (renewal) Form 303 or not, that may be of decisional significance so that the Commission can make a realistic decision based on all relevant factors." Southern Broadcasting Co., 38 F.C.C.2d 461, 464 (Rev.Bd.1972) (emphasis in original). Unlike a private party haled into court, or a corporation such as General Tire facing an investigation by the SEC, RKO had an affirmative obligation to inform the Commission of the facts the FCC needed in order to license broadcasters in the public interest. As a licensing authority, the Commission is not expected to "play procedural games with those who come before it in order to ascertain the truth," FCC Brief at 60, and license applicants may not indulge in common-law pleading strategies of their own devise.
 
 
 35
 The Decision and the record on which it is based demonstrate irrefutably that RKO did not meet these standards, and that RKO's conduct thus threatened "the integrity of the Commission's processes." RKO General, Inc., 82 F.C.C.2d 291, 306 (1980). In spite of an SEC investigation that was rapidly gathering steam, and in spite of the fact that its qualifications as a licensee were at issue before the FCC, RKO failed to come forward with a candid statement of relevant facts. RKO did not inform the FCC that the SEC had issued a formal order of investigation in February 1976, even though this suggested the seriousness of the charges against General Tire.[39] RKO did not advise the FCC of the SEC's preliminary findings until May 14, 1976, despite the fact that General Tire had advised its stockholders of these preliminary findings in February when it released its 1975 Annual Report.[40] RKO did not advise the FCC until May 1976 that General Tire's own internal investigation demonstrated that many of the SEC concerns were valid, even though Community had submitted General Tire's 10-K Report the previous March.[41] RKO never once attempted to amend or supplement its earlier pleadings with the FCC, despite a growing awareness of the facts that General Tire would later admit in its Special Report. These instances involve a lack of candor through omission. Whether or not RKO would have had an obligation to come forward with these facts under other circumstances,[42] it could not have doubted their relevance once the filings and petitions of the intervenors put these questions before the Commission. We need not decide whether RKO's pleadings were affirmatively misleading-it is enough to find that they did not state the facts.
 
 
 36
 The record suggests that RKO had ample motive for its failure to act with total candor during this period. There are numerous indications that General Tire initially decided to oppose the SEC investigation[43] and did not begin to cooperate with that agency until sometime in the spring of 1976. Clearly, it would have been pointless for General Tire to resist the SEC inquiry at one level while RKO came forward with damaging evidence against General Tire before the Commission. See Decision P 202. But such conjecture is not relevant, because the documents speak for themselves. It is also unnecessary to show that RKO officials had actual knowledge in early 1976 of the improprieties and illegalities to which General Tire later admitted, or that RKO officials willfully intended to misrepresent these facts to the FCC. Whether RKO sought to protect its parent, or whether the parent withheld information from the subsidiary in order to protect itself, the result is the same. We cannot improve on the language of FCC counsel: "It is obvious that where a complete disclosure of facts will militate against the interests of this organization, the Commission will be deprived of that information. It is irrelevant where in the RKO-General Tire organizational structure this breakdown in candor first occurs. In the end, RKO, as the public trustee, is responsible for the reliability of the information and representations furnished by it to the Commission." FCC Brief at 70; see Decision P 122 n.248.
 
 B. RKO's Defenses
 
 37
 RKO objects to the FCC's finding on a variety of grounds. First, it contends that "there is not a shred of evidence that ... the Commission was in fact 'misled' " by RKO. RKO Brief at 33. Such an argument has no pertinence to this appeal, as the Supreme Court observed forty years ago:
 
 
 38
 The fact of concealment may be more significant than the facts concealed. The willingness to deceive a regulatory body may be disclosed by immaterial and useless deceptions as well as by material and persuasive ones. We do not think it is an answer to say that the deception was unnecessary and served no purpose.
 
 
 39
 FCC v. WOKO, Inc., 329 U.S. 223, 227, 67 S.Ct. 213, 215, 91 L.Ed. 204 (1946). As the Commission correctly emphasizes, it must rely on the applicants who come before it for the truth of their representations; it cannot countenance willingness to mislead simply because there is no evidence that the Commission was in fact misled.
 
 
 40
 Equally unpersuasive is RKO's objection that its decision not to inform the Commission of the SEC investigation was made on advice of counsel. RKO Brief at 38 & n.102. It is true that reliance on counsel may render a severe sanction such as disqualification too harsh in some circumstances. See Asheboro Broadcasting Co., 20 F.C.C.2d 1, 3 (1969); cf. WEBR, Inc. v. FCC, 420 F.2d 158, 167-68 (D.C.Cir.1969). But "advice of counsel cannot excuse a clear breach of duty by a licensee." Asheboro, 20 F.C.C.2d at 3. The client becomes fully responsible at some point, and that point is reached more quickly in practice before the FCC than in courts of law. E.g., Wadeco, Inc. v. FCC, 628 F.2d at 128; Lorain Community Broadcasting Co., 18 F.C.C.2d 686, 688 (1969), aff'd sub nom. Allied Broadcasting, Inc. v. FCC, 435 F.2d 68 (D.C.Cir.1970). Similarly, although we agree that "legal argument is not testimony by a party or a representation by its counsel as to facts," RKO Brief at 34, we cannot excuse the calculated omissions in RKO's legal pleadings on this basis. In modern America, parties communicate with administrative agencies almost exclusively through lawyers, but this is all the more reason why we cannot assume that RKO did not know what its lawyers were saying-particularly when the number of pleadings and other opportunities for dissembling were as great as recounted above. It is not credible that lawyers were running the strategy of RKO and General Tire to the exclusion of all the corporate chiefs.
 
 
 41
 RKO's most persuasive objection to the FCC finding that it lacked candor is that the finding was made without giving RKO formal notice and a hearing on the charge. The FCC acknowledges a "technical failure to issue such a formal designation order," FCC Brief at 113 n.234, and admits that "(i)n the normal case a hearing probably would have been warranted." Id. at 97. Ordinarily, such an admission would constitute grounds for reversal, for courts "have stated time and again that reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are 'basic in our system of jurisprudence.' " Groppi v. Leslie, 404 U.S. 496, 502, 92 S.Ct. 582, 586, 30 L.Ed.2d 632 (1972) (quoting In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948)). We conclude, however, that RKO's conduct has been so egregious and so conspicuous that we cannot say the FCC's decision was an abuse of its authority. No purpose would have been served in this case by extending administrative proceedings that had already moved well into their second decade. The evidence of RKO's lack of candor was obvious from the documents that RKO itself had submitted to the FCC in this proceeding, as the applicants competing with RKO had been arguing for years. The Commission needed only to draw legal conclusions from "facts already known." Lakewood Broadcasting Service, Inc. v. FCC, 478 F.2d 919, 924 (D.C.Cir.1973). In this context, the FCC was not required to designate the candor issue and reopen the proceeding for an evidentiary hearing that would have served no purpose. See, e.g., Independent Bankers Ass'n. of Georgia v. Board of Governors of the Federal Reserve, 516 F.2d 1206, 1220-22 (D.C.Cir.1975); Municipal Light Boards v. FPC, 450 F.2d 1341, 1345 (D.C.Cir.1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972). This is especially true where RKO itself had urged that there was no need to reopen the proceeding because resolution of Community's claims "turns on inferences and legal conclusions" to be drawn from facts already before the Commission. See Colorado Radio Corp. v. FCC, 118 F.2d 24, 26 (D.C.Cir.1941) ("Appellant took its chance that the Commission, on the existing record, would (find in its favor). Now that the decision has gone against it, the appellant wants a chance to persuade the Commission with a supplemental record. We cannot allow the appellant to sit back and hope that a decision will be in its favor and then, when it isn't, to parry with an offer of more evidence.").
 
 
 42
 In reaching this determination, we start with the emphatic differences between a broadcast applicant before the FCC and one who faces the possibility of punishment. RKO has suffered a hardship as a result of the FCC's action, but it has not been punished; denial of a renewal application "is not a penal measure." FCC v. WOKO, Inc., 329 U.S. at 228, 67 S.Ct. at 215. As the Decision explains, the FCC's purpose is not to punish licensees for past wrongs, but to ensure that these "fiduciaries of a great public resource" will "satisfy the highest standards of character commensurate with the public trust that is reposed in them." Id. at P 3; see id. at P 249 & n.477. A broadcast license is less a property right than a privilege, Mansfield Journal Co. v. FCC, 180 F.2d 28, 35 (D.C.Cir.1950), and retention is not automatic but must be earned.
 
 
 43
 In practical terms, this means that "proceedings before the Commission are not private law suits," and that the Commission does not function "as an umpire blandly calling balls and strikes for adversaries appearing before it." See Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 620 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). The FCC has an affirmative obligation to license more than 10,000 radio and television stations in the public interest, each required to apply for renewal every three years. FCC Brief at 60 n.114. As a result, the Commission must rely heavily on the completeness and accuracy of the submissions made to it, and its applicants in turn have an affirmative duty to inform the Commission of the facts it needs in order to fulfill its statutory mandate. This duty of candor is basic, and well known. See, e.g., Sea Island Broadcasting Corp. v. FCC, 627 F.2d 240, 243 (D.C.Cir.), cert. denied, 449 U.S. 834, 101 S.Ct. 105, 66 L.Ed.2d 39 (1980); Golden Broadcasting Systems, Inc., 68 F.C.C.2d at 1101-04. The Commission has said before that "no specific misrepresentation or lack of candor issues are needed to consider these matters, since the Commission always has authority to deny a license or application where the record reveals such misconduct." Radio Carrollton, 69 F.C.C.2d 1139, 1146 n.20 (1978), aff'd mem. sub nom. Faulkner Radio, Inc. v. FCC, No. 79-1749 (D.C.Cir. October 15, 1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1758, 68 L.Ed.2d 238 (1981). See Grenco, Inc., 39 F.C.C.2d 732, 737 (1973) ("no one is allowed 'one bite' at the apple of deceit").
 
 
 44
 Ultimately, of course, the procedures of the Commission must be measured against the demands of due process as well as the statutory requirements of the Communications Act. But it is a truism that due process standards in this context are fluid rather than fixed. In WJR, The Goodwill Station, Inc. v. FCC, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949), a unanimous Court held that the FCC was not required to provide oral argument before ruling that a radio station's petition in a pending proceeding did not state facts sufficient to raise legal issues concerning the possible modification of that station's license rights. "(T)he right of oral argument as a matter of procedural due process varies from case to case in accordance with differing circumstances, as do other procedural regulations." Id. at 276, 69 S.Ct. at 1103. Subsequent cases have never departed from this proposition. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 268 n.15, 90 S.Ct. 1011, 1020, n.15, 25 L.Ed.2d 287 (1970); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 163, 71 S.Ct. 624, 644, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) ("The Court has responded to the infinite variety and perplexity of the tasks of government by recognizing that what is unfair in one situation may be fair in another.").
 
 
 45
 Section 4(j) of the Communications Act, as amended, 47 U.S.C. § 154(j) (1976), empowers the FCC to "conduct its proceedings in such a manner as will best conduce to the proper dispatch of business and to the ends of justice." In FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940), the Court held that Congress in that section had "explicitly and by implication" delegated to the FCC the power to resolve "subordinate questions of procedure." The Court upheld that delegation in light of the established principle that agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." Id. at 143, 60 S.Ct. at 441. In FCC v. Schreiber, 381 U.S. 279, 292, 85 S.Ct. 1459, 1468, 14 L.Ed.2d 383 (1965), the Court reiterated these observations in deciding whether a district court could substitute its own rules for the FCC's procedures governing public disclosure of its investigations. "The delegated power, of course, may not be exercised arbitrarily, but its exercise may not be impeached merely because reasonable minds might differ on the wisdom thereof." The Court also rejected the standard of review applied by the court of appeals: "The question for decision was whether the exercise of discretion by the Commission was within permissible limits, not whether the District Judge's substituted judgment was reasonable." Id. at 291, 85 S.Ct. at 1468 (emphasis by the Court). Cf. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).
 
 
 46
 It is true that these recognitions of the FCC's discretion over certain questions of procedure have been cited most frequently to support agency control over dockets and hearing formats. When a statute dictates that parties receive notice and a hearing, of course, the provision of those basic procedural rights is not left to be decided by administrative "flexibility" or "discretion." For that reason, RKO contends that Section 309 of the Act, 47 U.S.C. § 309 (1976), requires a hearing prior to the denial of a renewal application even when there are no substantial or material questions of fact. RKO Brief at 15-23. See Gottfried v. FCC, 655 F.2d 297, 310 (D.C.Cir.1981); United States v. FCC, 652 F.2d 72, 88-92 (D.C.Cir.1980). But such a literal approach to the words of the Act cannot govern this case, in which RKO had already been the subject of FCC proceedings that had lasted for years. The question is not whether RKO was entitled to a hearing under Section 309, but whether during the course of agency proceedings in which this candor issue arose in the most obvious and unavoidable manner, the Commission was required to call a halt to its proceedings, designate the issue formally, and begin again.
 
 
 47
 We conclude that such an approach in this case would not have promoted "the proper dispatch of business" and "the ends of justice." At some point in any administrative process, someone must determine whether the remaining issues are factual or legal, and whether hearings that have already been held must be supplemented by further proceedings. The initial answer must come from the agency, subject always to judicial review, but courts may defer to agency expertise and discretion here no less than on questions of docket management and the need for oral argument. Our decisions show the inherent difficulty of defining this administrative discretion. Compare Radio Athens, Inc. (WATH) v. FCC, 401 F.2d 398, 401 (D.C.Cir.1968) ("elemental fairness" used to judge whether FCC application requirements were sufficiently clear to obviate need for hearing on incomplete submission) with Ranger v. FCC, 294 F.2d 240 (D.C.Cir.1961) (where application fails in material respects to comply with FCC rules concerning application contents, agency can reject application without hearing). Nevertheless, in appropriate situations, agency resolution of "subordinate questions of procedure" will be respected. In Ranger, we held that Section 309 requires a hearing only if, "with the required information before it," the FCC still cannot make a determination as to whether granting the application would be in the public interest. Id. at 242. We thereby recognized the FCC's authority to determine without an evidentiary hearing whether applicants had submitted "the required information." Cf. Guinan v. FCC, 297 F.2d 782, 785 (D.C.Cir.1961) (FCC need not designate comparative hearing "once it has been established that one of the competing applicants is basically unqualified" because of frequency interference). The Commission's discretion should also be respected in this case, in which RKO has obviously failed to supply the information required for consideration of its merit in the public interest.
 
 
 48
 We find a compelling if imperfect analogy between this case and "historical exceptions to the general principle that punishment can only follow a determination of guilt after trial or plea-exceptions such as the power summarily to punish for contempt of court." Bell v. Wolfish, 441 U.S. 520, 536 n.17, 99 S.Ct. 1861, 1872 n.17, 60 L.Ed.2d 447 (1979).
 
 
 49
 Where the contempt is committed directly under the eye or within the view of the court, it may proceed "upon its own knowledge of the facts, and punish the offender, without further proof, and without issue or trial in any form."
 
 
 50
 In re Savin, 131 U.S. 267, 277, 9 S.Ct. 699, 701, 33 L.Ed. 150 (1889) (quoting Ex parte Terry, 128 U.S. 289, 309, 9 S.Ct. 77, 81, 32 L.Ed. 405 (1888)). In these extraordinary situations, "(t)here is no need of evidence or assistance of counsel before punishment, because the court has seen the offense. Such summary vindication of the court's dignity and authority is necessary." Cooke v. United States, 267 U.S. 517, 534, 45 S.Ct. 390, 394, 69 L.Ed. 767 (1925). The rule is as old as Blackstone, see 4 W. Blackstone, Commentaries * 282-* 285, and continues to have vitality in this day. E.g., Roadway Express, Inc. v. Piper, 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980). Modern jurisprudence may reveal a greater sensitivity for the notice and hearing requirements of due process than did an earlier age, of course. See Taylor v. Hayes, 418 U.S. 488, 498, 94 S.Ct. 2697, 2703, 41 L.Ed.2d 897 (1974). Nevertheless, the cases continue to suggest the existence of a dividing line between events that take place "before the judge's own eyes," id. at 499, 94 S.Ct. at 2703, or "in the face of the court," Ex parte Terry, 128 U.S. at 313, 9 S.Ct. at 82, and situations in which "some essential elements of the offense are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about these essential elements ...." Johnson v. Mississippi, 403 U.S. 212, 215, 91 S.Ct. 1778, 1779, 29 L.Ed.2d 423 (1971). There is no doubt here as to which side of that line RKO's conduct falls. The Commission has drawn legal conclusions after comparing what RKO said in its earlier pleadings-and what it did not say-with RKO's subsequent admissions, such as General Tire's Special Report. RKO does not for a moment contend that it has in fact been candid with the Commission, nor do we see how it possibly could. No evidence remains to be introduced; no witnesses have been denied a chance to speak. There are no further issues to try. The FCC has not assumed the answers to any questions of fact, but has simply examined uncontested and uncontestable documents that are in the record at RKO's own election.
 
 
 51
 Because the Commission had "so perfect a knowledge" of the RKO misconduct that was evident from the documents directly before it, we cannot say that the Commission's action was erroneous. Forty years ago, in FCC v. Pottsville Broadcasting Co., Justice Frankfurter reflected on the "movement for administrative regulation." He observed:
 
 
 52
 Perhaps the most striking characteristic of this movement has been the investiture of administrative agencies with power far exceeding and different from the conventional judicial modes for adjusting conflicting claims-modes whereby interested litigants define the scope of the inquiry and determine the data on which the judicial judgment is ultimately based. Administrative agencies have power themselves to initiate inquiry, or, when their authority is invoked, to control the range of investigation in ascertaining what is to satisfy the requirements of the public interest .... These differences in origin and function preclude wholesale transplanation of the rules of procedure, trial, and review which have evolved from the history and experience of courts.
 
 
 53
 309 U.S. at 142-43, 60 S.Ct. at 441. The cases upholding summary punishment for in-court contempts without the need for formal notice or a separate hearing a fortiori support the disqualification of RKO. As we explained above, this case does not involve punishment at all, but the renewal of a public trust.[44]
 
 
 54
 Our decision to affirm the FCC's action should not be read to include situations not covered by this unique record. The Commission concedes that "this case is unprecedented," FCC Brief at SA-1, and we expect that successors if any will be rare. Before the FCC can take action of this sort in the future, we believe that at least three conditions must be met in order to protect the parties. First, not only must the misconduct occur directly before the agency, but it should be of such a blatant and unacceptable dimension that its existence cannot be denied. The FCC has satisfied itself that this is the case with regard to RKO, whose lack of candor "is abundantly clear." Decision P 196. Second, although formal notice may not always be necessary, it should be evident that the party has some form of actual notice of the conduct said to be at issue, and must not be prejudiced by surprise. Finally, the party must be given an "opportunity to speak in (its) own behalf in the nature of a right of allocution." Groppi v. Leslie, 404 U.S. at 504, 92 S.Ct. at 587. The procedure adopted by the FCC in this case satisfies these requirements, at least insofar as the Boston renewal is concerned. RKO does not contend that it was prejudiced by the lack of notice, for it undoubtedly had actual notice of the candor issue, as the pleadings filed prior to the Commission's decision demonstrate.[45] See Harbenito Broadcasting Co. v. FCC, 218 F.2d 28, 31 (D.C.Cir.1954). "If it is clear that the parties understand exactly what the issues are when the proceedings are had, they cannot thereafter claim surprise or lack of due process because of alleged deficiencies in the language of particular pleadings." Kuhn v. CAB, 183 F.2d 839, 842 (D.C.Cir.1950). RKO does not contend that it was denied any opportunity to present for the Commission's determination any matter of fact or law, or that the Commission has not given all matters submitted by RKO due and full consideration. See WJR v. FCC, 337 U.S. at 284, 69 S.Ct. at 1107. RKO had a full opportunity to speak in its own behalf, and exercised it in pleadings, proffers of proof, and oral argument before the Commission.[46] We cannot say that the FCC abused its discretion by not giving RKO a formal hearing on issues arising from RKO's conduct during the initial proceeding.[47] Section 309 was not intended by Congress to reward delay and concealment that disserves the public interest. "Congress did not intend by this section of the statute to require the formality of Commission consideration of and (re) hearing on an application in which the signatory obviously fails in major material respects to abide the regulations." Ranger v. FCC, 294 F.2d at 243. Cf. Storer Broadcasting Co. v. FCC, 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1082 (1956) ("We do not think Congress intended the Commission to waste time on applications that do not state a valid basis for a hearing."). The FCC's denial of the Boston license renewal must therefore be affirmed.
 
 
 55
 IV. THE LOS ANGELES AND NEW YORK CITY PROCEEDINGS
 
 
 56
 The narrow basis of our decision concerning RKO's Boston license illustrates why the FCC may not deny license renewals in Los Angeles and New York City simply because it happened to condition those proceedings on the Boston outcome. RKO's lack of candor during the Boston proceeding justifies its disqualification there because the misconduct took place directly before the trier of fact and has bearing on its general character, but the same cannot be said of the Los Angeles and New York City proceedings. The latter was conditioned on the Boston outcome in order to avoid making the parties "relitigate those issues" that had already been specified with regard to Boston. 46 F.C.C.2d at 249. By contrast, the former had been conditioned on the reciprocity issue only, in order to "enable the Commission to proceed with the Los Angeles matter and bring it to a conclusion with no risk to the public interest." RKO General, Inc. (KHJ-TV), 31 F.C.C.2d 70, 74 (1971). The FCC could not have known, when it conditioned either of these proceedings as it did, that the Boston outcome would turn on a lack of candor issue that had not even been designated in the Boston proceeding. RKO's misconduct did not occur directly before the trier of fact in either the Los Angeles or New York City proceedings. Accordingly, these decisions must be remanded to the Commission for further consideration as it deems appropriate.
 
 
 57
 This conclusion is buttressed by the Commission's own discussion of what effect, if any, RKO's Boston disqualification should have on its other broadcast licenses. In an order released on November 26, 1980, the FCC designated thirteen RKO stations for hearing, but held those proceedings in abeyance until resolution of this appeal. RKO General, Inc., 82 F.C.C.2d 291, appeal pending sub nom. New South Media Corp. v. FCC, 644 F.2d 37 (D.C.Cir.1980). One purpose of the separate proceeding will be to allow RKO "to introduce evidence on meritorious programming with respect to the 13 other stations and any other mitigating evidence with respect to the remaining licenses." Id. at 318.
 
 
 58
 Now that the issues in the Boston proceeding have been sorted out, the same treatment is appropriate for RKO's New York City and Los Angeles licenses.[48] The judgment that RKO showed a lack of candor in the Boston proceeding is res judicata, of course, and is not subject to collateral attack in these subsequent proceedings. See id. at 312-18. The Commission may give that finding whatever weight it considers appropriate. Indeed, it may well be that such a finding is inconsistent with a licensee holding a license anywhere, although that decision is for the Commission in the first instance. At the same time, our remand of these proceedings is more than just an empty exercise. Each of RKO's renewal applications arises in different contexts and presents different levels of complexity.[49] For example, the Los Angeles renewal was tentatively granted in 1973 subject only to future reciprocity findings. Because we have rejected reciprocity as a legitimate basis for disqualification of RKO in Boston, the Los Angeles situation may seem quite different when that proceeding is remanded. As the FCC noted, "We do agree with RKO that collateral estoppel will only apply to those grounds on which the court bases its decision." Id. at 317. Similarly, individual stations have different broadcast histories and policies. Although the FCC found that WNAC in Boston had a "mediocre to poor record with respect to news, public affairs, and local programming," Decision P 227, it made no new findings at all with regard to KHJ in Los Angeles and WOR in New York City. These stations are entitled to an opportunity to appear directly before the Commission and to argue that they deserve different treatment than RKO's Boston station. After such a proceeding, of course, the Commission's broad latitude in "the choice of remedies and sanctions" must be respected. Leflore Broadcasting Co. v. FCC, 636 F.2d at 463 (quoting Lorain Journal Co. v. FCC, 351 F.2d 824, 831 (D.C.Cir.1965), cert. denied sub nom. W.W.I.Z., Inc. v. FCC, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966)).
 
 CONCLUSION
 
 59
 This opinion will not close a sorry chapter in the history of American communications law. We must remand the Los Angeles and New York City proceedings because the FCC has not yet provided a principled explanation for RKO's disqualification as a licensee of those stations. The FCC's findings that RKO intentionally misrepresented financial information and engaged in unlawful reciprocal trade practices cannot stand, for one was reached without notice or hearing and the other constitutes an ex post facto application of new standards to conduct that is long past.
 
 
 60
 We affirm the FCC's decision in the Boston proceeding, however, because the Commission's finding that RKO displayed an egregious lack of candor in that proceeding does not suffer from either of these infirmities. During an administrative review that had already lasted for years, the FCC suddenly was confronted by documentary evidence establishing beyond doubt that RKO had been less than candid with the Commission in the very proceeding under way. The FCC could observe all material facts for itself, simply by comparing the documents that had already been submitted with those that were now before it.
 
 
 61
 The denial of a license renewal to a major licensee in a major market is of manifest moment and financial impact. The FCC's decision has not been reviewed callously, and we have tried not to lose sight of the difficult issues in this case by sweeping the reasoning of the Commission under a rug of agency expertise or administrative convenience. The record presented to this court shows irrefutably that the licensee was playing the dodger to serious charges involving it and its parent company. The Commission was entitled to ask whether such conduct, however convenient for corporate purposes, was consistent with the candor required of an applicant for a license to the public airwaves. We believe the Commission's answer is not open to doubt. The disqualification of RKO as a licensee of WNAC in Boston is affirmed.
 
 
 62
 It is so ordered.
 
 
 
 [1]
 General Tire, which owns 100 percent of RKO's stock, was founded in 1915 by William O'Neil. Three of his sons and one daughter owned or controlled over nine percent of General Tire's stock as of July 1979, and each of the sons is a director of the company. T. F. O'Neil is Chairman of the Board of both General Tire and RKO, and is the Chief Executive Officer of RKO. M. G. O'Neil is President and Chief Executive Officer of General Tire. The Commission concluded that the two companies "are owned, controlled, and operated as a single integrated company." RKO General, Inc. (WNAC), 78 F.C.C.2d 1, 60 (1980), at P 119 (hereinafter cited as Decision, by P )
 
 
 [2]
 See RKO General, Inc. (KHJ-TV) (Initial Decision), 44 F.C.C.2d 149 (1969). Reciprocal trade practices are agreements whereby one company conditions its purchase of goods from another company on the second company's willingness to purchase other products from the first. The FCC found that General Tire frequently conditioned its purchases of goods and services on the expectation that the seller would purchase advertising time on RKO stations. Decision P 2(a). The Decision concluded that such reciprocal trading "was anticompetitive, probably violative of the antitrust laws, and (in the case of RKO) corruptive of the normal free market process by which the demand for advertising time helps ensure that radio and television programming is responsive to public desires." Id. See generally Handler, Emerging Antitrust Issues, 49 Va.L.Rev. 433 (1963); Hausman, Conglomerate Mergers, 77 Harv.L.Rev. 873 (1964); Turner, Conglomerate Mergers, 78 Harv.L.Rev. 1313 (1965)
 
 
 [3]
 RKO General, Inc. (KHJ-TV), 44 F.C.C.2d 123 (1973)
 
 
 [4]
 In 1967, the Department of Justice had brought a civil suit against General Tire, RKO, and two other General Tire subsidiaries, charging that their reciprocal trade practices violated the Sherman Antitrust Act. United States v. General Tire & Rubber Co., No. C-67-155 (N.D.Ohio, filed March 2, 1967). This action was still pending when the FCC designated a comparative hearing on renewal of WNAC in 1969. A consent decree was entered on October 21, 1970. 1970 Trade Cas. § 73,303 (1970)
 
 
 [5]
 RKO General, Inc. (WOR-TV), 46 F.C.C.2d 246 (1974). The intervenor in this proceeding was initially found financially unqualified but that decision was overturned in Multi-State Communications, Inc. v. FCC, 590 F.2d 1117 (D.C.Cir.1978), cert. denied sub nom. RKO General, Inc. v. Multi-State Communications, Inc., 440 U.S. 959, 99 S.Ct. 1501, 59 L.Ed.2d 773 (1979)
 
 
 [6]
 RKO General, Inc. (WNAC-TV) (initial decision), 78 F.C.C.2d 147, 254-335 (1974). The ALJ concluded that General Tire's "trade relations" practices "do not adversely reflect upon RKO's qualifications to continue a licensee of the Commission or to warrant comparative demerit." Id. at 347
 
 
 [7]
 See, e.g., SEC, Report on Questionable and Illegal Corporate Payments and Practices, submitted to the Senate Comm. on Banking, Housing and Urban Affairs, May 12, 1976, reprinted in 642 Fed.Sec.L.Rep. (CCH), Part II (May 19, 1976)
 
 
 [8]
 Community Petition to Reopen the Record, Enlarge the Issues and Remand for Further Hearing (Community Petition), December 10, 1975, J.A. 535. The petition was triggered by newspaper reports of an investigation of General Tire by the government of Chile. Id. at 4, J.A. 538
 
 
 [9]
 RKO Opposition to the Petition to Reopen the Record, Enlarge the Issues, and Remand for Further Hearing (RKO Opposition), January 21, 1976, at 5, J.A. 588
 
 
 [10]
 Final Judgment of Permanent Injunction against the General Tire & Rubber Company and M. G. O'Neil, No. 76-0799 (D.D.C. May 10, 1976)
 
 
 [11]
 Transcript, WNAC-TV Proceeding, at 15406-08, J.A. 2641-43
 
 
 [12]
 The consent decree required creation of a Special Review Committee, composed of five non-management directors assisted by Special Counsel, who were to conduct
 an extensive investigation into the use of corporate funds for unlawful political contributions, gifts, entertainment or other disbursements for similar improper purposes; and use of corporate funds for improper payments to governmental employees and officials, foreign or domestic; the establishment and maintenance of, and transactions in, any secret or unrecorded funds; the use of agents and consultants for unlawful or improper purposes or in connection with unlawful or improper conduct; and such other similar matters as may be revealed during the course of the investigation.
 Special Report at 27, J.A. 1267.
 
 
 [13]
 RKO Response to Community Motion to Deny (RKO Response), October 28, 1977, at 34-36, J.A. 805-07
 
 
 [14]
 In 1978, the New England Television Corporation (NE-TV) was formed as the result of a merger between two of RKO's competing applicants for the Boston station, Community Broadcasting of Boston, Inc. (Community) and The Dudley Station Corporation (Dudley). After lengthy negotiations, Community and Dudley entered into a settlement agreement with RKO whereby RKO would sell its Boston license to NETV upon a finding by the FCC that RKO possessed the requisite qualifications to be a broadcast licensee. Brief for Intervenors NETV, Dudley, and Community at 5. When the Commission could not find RKO minimally qualified, however, General Tire rejected NETV's offer to buy RKO's unlicensed assets. Id
 
 
 [15]
 FCC Order 79-403, June 28, 1979, J.A. 350. RKO reiterated its earlier claim that "(t)he record in this proceeding is fully sufficient for the Commission to adjudge that RKO is qualified to be a broadcast licensee and thus qualified to remain the licensee of WNAC-TV." Summary of RKO's Position, July 9, 1979, J.A. 834. It now urged, however, that the record was not sufficient for the FCC to adjudge RKO "unqualified." J.A. 839
 
 
 [16]
 Decision P 43; see J.A. 352 (informal FCC announcement that "tentative" 4-2 vote had found record insufficient to permit finding RKO qualified)
 
 
 [17]
 FCC Order 79-453, July 20, 1979, J.A. 353
 
 
 [18]
 J.A. 857, 869, 875, 880, 889, 1083 (proposed findings and conclusions filed by RKO, Broadcast Bureau, and four competing applicants)
 
 
 [19]
 RKO General, Inc. (WNAC-TV), 78 F.C.C.2d 1 (1980) (the Decision); RKO General, Inc. (KHJ-TV), 78 F.C.C.2d 355 (1980); RKO General, Inc. (WOR-TV), 78 F.C.C.2d 357 (1980)
 
 
 [20]
 Were these grounds not independent, a remand would probably be required so that the Commission could articulate the "relative weight" of "the factors that affect its decision," and determine whether the disqualification of RKO is still appropriate. Leflore Broadcasting Co. v. FCC, 636 F.2d 454, 463 (D.C.Cir.1980); see United States v. Third National Bank, 390 U.S. 171, 183, 88 S.Ct. 882, 890, 19 L.Ed.2d 1015 (1968)
 
 
 [21]
 Our conclusion is consistent with the FCC's subsequent argument, see FCC Brief at 97 n.215 (candor, misrepresentation, and reciprocal trade practices are "independent pillars" of Decision), and subsequent Commission opinions describing this RKO Decision. See, e.g., RKO General, Inc., 82 F.C.C.2d 291, 292-94 (1980), appeal pending sub nom. New South Media Corp. v. FCC, 644 F.2d 37 (D.C.Cir.1980) (reciprocity, lack of candor, and false financial reports are "separate grounds" for disqualification); Cowles Broadcasting, Inc., 49 Rad.Reg.2d (P&F) 1138, 1148 n.47 (1981) (candor, reciprocity, and General Tire's nonbroadcast misconduct were "independent grounds" for disqualification); Cablecom-General, Inc., 87 F.C.C.2d 784, 786 (1981) (reciprocal trade practices, false financial reports, and lack of candor were "separate grounds" for disqualification)
 
 
 [22]
 E.g., California Packing Corp., 25 F.T.C. 379 (1937); Mechanical Mfg. Co., 16 F.T.C. 67 (1932); Waugh Equipment Co., 15 F.T.C. 232 (1931). All three cases involved companies with substantial market power over their suppliers that used threats to withdraw future patronage unless reciprocal purchases were made. As a result, these cases "shed little or no light on the question of the legality of reciprocity arrangements in which neither participant possesses leverage." United States v. General Dynamics Corp., 258 F.Supp. 36, 57 n.150 (S.D.N.Y.1966)
 
 
 [23]
 E.g., FTC v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); United States v. Ingersoll-Rand Co., 320 F.2d 509 (3d Cir. 1963); United States v. General Dynamics Corp., 258 F.Supp. 36 (S.D.N.Y.1966). These cases condemned mergers because of a danger that the companies would engage in reciprocal trading, focusing on the legality under Section 7 of the Clayton Act, 15 U.S.C. § 18 (1976), of conglomerate mergers in which the acquiring company had substantial market power over its suppliers
 
 
 [24]
 In Consolidated Foods, the Supreme Court observed that reciprocity "is one of the congeries of anticompetitive practices at which the antitrust laws are aimed," 380 U.S. at 594, 85 S.Ct. at 1221, and that anticompetitive effects "may ensue not from bludgeoning or coercion but from more subtle arrangements," id. The case stopped short of such a broad holding, however, because the Court recognized that the defendant corporation "commands a substantial share of a market" and that "the probability of a lessening of competition is shown." Id. at 595, 600, 85 S.Ct. at 1222, 1225. Other early cases also involved corporations with substantial market power. E.g., General Dynamics, 258 F.Supp. at 61-62; Ingersoll-Rand, 320 F.2d at 524
 Commentators also interpreted Consolidated Foods as requiring that companies be demonstrated to have the "necessary purchasing power." Kintner, The Anatomy of Reciprocity, 56 A.B.A.J., 232, 234 (1970). An Assistant Attorney General in the Antitrust Division later wrote that there was "respectable support for the proposition that mutual patronage reciprocity was legal" at least until 1967. Tire Company Cases-U.S. Information Memorandum, Trade Reg.Rep. (CCH) P 50,259, at 55,504 (1967). The Supreme Court had shown a related concern for market leverage in the tying cases, e.g., Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947). Judge Bazelon's dissent to denial of rehearing in Fidelity Television, Inc. v. FCC, 515 F.2d at 698, contended that reciprocal trading was manifestly illegal. He agreed, however, that there was a question about "the degree of market power necessary to make reciprocity illegal. There is some confusion in the cases, particularly when one refers to the tie-in cases, on whether some kind of market leverage must be shown to make reciprocity illegal." Id. at 720 n.59. It has been suggested recently that in some cases reciprocity may be innocuous and that in others it may have "economic virtues." Industria Siciliana Asfalti, Bitumi v. Exxon, 1977-1 Trade Cas. P 61,256, at 70,779 n.4 (S.D.N.Y.1977).
 
 
 [25]
 See, e.g., Hausman, supra note 2, at 882 (despite widespread reciprocal trading, most businessmen detested the practice); Turner, supra note 2, at 1390 & n.100 (1965) (predicting rough treatment for nonleveraged reciprocal trading "when appropriate cases reach the courts"). By 1970, when test suits against a number of corporations including General Tire had established the illegality of noncoercive reciprocity, most businessmen had already abandoned their "trade relations" voluntarily. Kintner, supra note 24, at 233
 
 
 [26]
 See Pressley v. FCC, 437 F.2d 716, 721 n.5 (D.C.Cir.1970) (before FCC can find bad character on basis of applicant misconduct, there must be "adequate prior notice of a standard by which conduct can be measured"); Straus Communications, Inc. v. FCC, 530 F.2d 1001, 1011 (D.C.Cir.1976) ("The licensee's violation, then, consisted fundamentally in failing to predict the new interpretation"); AFL-CIO v. FEC, 628 F.2d 97, 101 (D.C.Cir.), cert. denied, 449 U.S. 982, 101 S.Ct. 397, 66 L.Ed.2d 244 (1980) ("uncertainty as to the meaning of the law can be considered in assessing the element of willfulness in a violation of the law")
 
 
 [27]
 In the original KHJ-TV proceeding in Los Angeles, the Commission had found that "the relevant legal and economic concepts were in a state of flux at the time covered by this record, that neither responsible officials nor the courts had given any clear explanation of the applicability of the broadly drawn (antitrust) statutes, and that there was accordingly no certainty that trade relations practices were improper." RKO General, Inc. (KHJ-TV), 44 F.C.C.2d at 129-30. In the initial decision in the WNAC proceeding in Boston, the ALJ concluded: "The extensive additional evidence adduced herein merely reinforces the conclusions reached in the KHJ-TV proceeding." Initial Decision, 78 F.C.C.2d at 333, P 378
 
 
 [28]
 In Fidelity Television, Inc. v. FCC, this court noticed that there was "a fairly substantial record ... on the reciprocity practices of RKO, not merely in its operation of KHJ, but throughout the entire broadcast side of its business." 515 F.2d at 696-97. See 78 F.C.C.2d at 137 (Commissioner Lee dissenting) ("additional evidence" in WNAC proceeding was "essentially the same evidence" considered in KHJ proceeding). It has always been clear that RKO's use of reciprocity has been less than that of other General Tire subsidiaries, and nothing in the Decision alters this conclusion. RKO also notes that the Decision refers to only two documents not in the KHJ-TV record: an advertising agency letter of August 1962, and a letter from Lyon Van Lines to a General Tire official in 1964. We are troubled by the FCC's conclusion that RKO engaged in coercive reciprocity with Equitable Life Assurance Society, Decision P 83(1), because there is no finding that General Tire had the market power necessary to "overbear the will of the other party." Id. at P 68. The FCC shows only that General Tire paid an annual premium to Equitable of $14 million in 1968, and makes much of aggressive remarks by one employee. Id. at P 83(1); see FCC Brief at 58 n.112. But the requisite market power cannot be found in mere size or posturing alone. The Commission's finding that Equitable "eventually acceded" to the supposedly coercive threats of General Tire rests on an advertising agency letter of August 1962, some six months prior to the time that General Tire's "coercion" supposedly occurred. Decision P 83(1)
 
 
 [29]
 RKO contends that the bulk of its trade relations practices ended before 1965, and the rest by 1966. See Initial Decision, 78 F.C.C.2d at 252-323, PP 254-363. The 1967 suit against General Tire by the Department of Justice, see note 4 supra, resulted in a consent decree in 1970, and there is no allegation that any violation of that decree has occurred. All five examples of reciprocity cited by the FCC in its Decision concerned conduct that took place between 1961 and 1965. Decision P 83
 
 
 [30]
 Trade and barter transactions are exchanges of a station's broadcast time for goods, products, and other services. RKO's controller criticized internal accounting procedures for these barters in December 1972. Special Report at 223, J.A. 1463. On May 13, 1974, an internal audit discovered "failures to fully comply with ... prior directives," Affidavit of RKO Controller John B. Fitzgerald, August 23, 1979, J.A. 970, and found "serious deficiencies" in financial records. The controller issued another directive on July 10, 1974, but a second internal audit in 1976 revealed that "many of the problems found in 1974 still exist." Special Report at 225, J.A. 1465. An investigation by an outside accountant confirmed these findings. The Special Report concluded: "RKO's files were found by Arthur Young to be incomplete and unreliable, which created inaccuracies on the FCC Form 324 reports as well as on internal trade status reports." Id. at 226, J.A. 1466
 
 
 [31]
 The FCC did not require reports of trade and barter information until 1971, in Rand Broadcasting Co., 22 Rad.Reg.2d (P&F) 155 (1971) (interpreting 47 C.F.R. § 73.3611). On February 17, 1972, the FCC issued a Public Notice reminding licensees of the requirement that this information be included in the annual financial reports (Form 324). Reporting "Trade Outs," 34 F.C.C.2d 439 (1972). RKO emphasizes that the figures a broadcaster was required to certify were necessarily to be based on estimates, and that RKO's controller was required only to certify the forms as correct to "the best of my knowledge, information and belief." RKO Brief at 27 & n.79. See 78 F.C.C.2d at 137 (Commissioner Lee dissenting) (FCC "has recognized in its instructions to Schedule 1 of FCC Form 324 that values for trade and barter income are, at best, estimates"). Indeed, the Commission acknowledged in 1980 that "the current financial data are neither reliable ... nor are they consistent across different stations," and that "these problems are principally due to the inadequacies of the design of the form itself and are not the fault of stations that file the reports." Notice of Proposed Rulemaking, BC Docket No. 80-190, 45 Fed.Reg. 35370, 35372 (May 27, 1980). It is therefore not clear whether RKO's filings differed appreciably from those of other licensees. Moreover, barter transactions are said to account for less than five percent of total station revenues, and to have no effect on net profit figures because the revenues exactly offset the expenses. See 39 FCC Ann.Rep. 225, 228-76 (1973)
 
 
 [32]
 The FCC relies on a lengthy line of cases upholding its discretion to decide whether hearings on petitions to deny are necessary. E.g., United States v. FCC, 652 F.2d 72, 90 n.87 (D.C.Cir.1980); National Ass'n. for Better Broadcasting v. FCC, 591 F.2d 812, 815 (D.C.Cir.1978); Columbus Broadcasting Coalition v. FCC, 505 F.2d 320, 324 (D.C.Cir.1974); Stone v. FCC, 466 F.2d 316, 322-23 (D.C.Cir.1972); Marsh v. FCC, 436 F.2d 132, 135-36 (D.C.Cir.1970). But see Los Angeles Women's Coalition v. FCC, 584 F.2d 1089 (D.C.Cir.1978); Folkways Broadcasting Co. v. FCC, 375 F.2d 299, 305 (D.C.Cir.1967). These cases are inapposite because they do not concern denials of applications without a hearing. The fact that an application can be granted without a hearing has no bearing on whether an application may be denied without a hearing when there are unresolved, material questions of fact
 Similarly, the FCC's procedures for summary judgment require Commission notice that summary disposition is intended on "issues set for hearing," 47 C.F.R. § 1.251(a)(1) (1979). Before an agency may use such procedures, it must be able to show that evidentiary hearings could serve no purpose. USV Pharmaceutical Corp. v. Secretary of HEW, 466 F.2d 455, 461 (D.C.Cir.1972). The FCC cannot make such a showing here, and certainly has not given the requisite notice. Indeed, in 1977 the Commission rejected a Freedom of Information Act request by Community for RKO's Form 324 reports because "(w)e cannot see how the Special Review Committee has placed RKO's financial reports in issue before this Commission." See Decision P 194 n.393.
 
 
 [33]
 But see FCC v. WOKO, Inc., 329 U.S. 223, 228, 67 S.Ct. 213, 215, 91 L.Ed. 204 (1946) (FCC is not bound "to deal with all cases at all times as it has dealt with some that seem comparable"). The FCC notes that corporate misconduct often can be cured by replacing management and directors, whereas individual malfeasants may not so easily change their spots. See Decision PP 233-35
 
 
 [34]
 RKO correctly observes that the record provides no basis for finding that any RKO officer or director participated in the General Tire misconduct or knew of that misconduct until the disclosures arising from the SEC investigation and the related internal inquiries of the General Tire board. RKO Brief at 71. See RKO Proposed Findings, Conclusions and Proffered Evidence, August 27, 1979, Aff. 1 (T.F. O'Neil) at 1-2, J.A. 940-41. The ALJ found that General Tire leaves the operation of RKO stations to the RKO Board of Directors and management. Initial Decision, 78 F.C.C.2d at 254, P 260. Although General Tire's chief executive officer, M.G. O'Neil, was one subject of the SEC consent decree, see note 10 supra, no such decree was filed against his brother T.F. O'Neil, the chief executive officer of RKO
 
 
 [35]
 Based on three volumes of exhibits totaling 640 pages, Community alleged that General Tire had engaged in "illegal, unethical and improper conduct in the United States ... and in foreign countries," including the bribery of foreign public officials, establishment of secret accounts to evade banking and tax codes of foreign nations, and defrauding stockholders of its partially owned subsidiaries. Community further alleged that these activities violated securities and tax laws of the United States, and that RKO had attempted "to conceal, mislead and deceive" the FCC as well as the public by failing to disclose material information relevant to these allegations. Community Petition, supra note 8, J.A. 535. General Tire ultimately admitted all of these practices in its Special Report, after acknowledging the preliminary findings of several investigations in its 1975 Annual Report and 10-K. J.A. 686
 
 
 [36]
 RKO Opposition, supra note 9, at 5, 17, J.A. 588, 600. RKO also noted gratuitously that Community had failed to "assert any improper political contributions by General Tire in the United States." Id. at 5 n., J.A. 588 n
 
 
 [37]
 See RKO Brief at 33 & n.92 (Opposition was "a straight-forward pleading"). This appears to have been the interpretation of the FCC's Broadcast Bureau. See Broadcast Bureau's Comments on Supplement to Reply, March 22, 1976, at 4, J.A. 693. In a later statement, the Broadcast Bureau suggested that RKO's Opposition "presented arguments relating to the inadequacy of Community's showing and not factual assertions." Broadcast Bureau Reply of September 24, 1979, at 16, J.A. 1207. The Commission also concedes that RKO's statements "may have been technically correct." FCC Brief at 63
 
 
 [38]
 Congress amended the Communications Act in 1960 to require that petitioners seeking to deny a license renewal must provide a more substantial evidentiary showing than had previously been required in order to force the Commission to designate a hearing. See S.Rep.No.690, 86th Cong., 1st Sess. 3 (1959), U.S.Code Cong. & Admin.News 1960, p. 3516. The FCC's rules require that factual showings necessary to meet this burden be made by affidavit. 47 C.F.R. § 1.229 (1979)
 
 
 [39]
 The FCC contends that had the SEC investigation continued only a few months longer, "the Commission might never have known about the investigation or been in a position to condition any renewal on the outcome of the investigation and any resulting litigation." FCC Brief at 78-79. RKO responds that it would have been "absurd" for RKO to "cover up" the SEC investigation in light of contemporary newspaper reports of that investigation. RKO Reply Brief at 17; see Wall Street Journal, Feb. 12, 1976, at 4, col. 2, J.A. 569; Washington Post, Feb. 13, 1976, at A6, col. 1. But other, more prominent parties have attempted such cover-ups in the past despite even greater attention from the media, and in any event the Commission cannot be expected to reply only on hearsay sources for the information required under section 1.65
 
 
 [40]
 General Tire's 10-K reported investigations in Morocco, Romania, Chile, and "yet another foreign country" that raised issues concerning the possibility of "improper or illegal payments to foreign government employees." It added that a pending internal investigation "includes the matter of political contributions in the United States by executive level employees" of General Tire. J.A. 686-89
 
 
 [41]
 Community Supplement to Reply (Supplement to the Reply), March 16, 1976, & Att. A., J.A. 678, 686. RKO argues that even if § 1.65 applied, Community performed RKO's task for it by filing copies of General Tire's 10-K with the Commission before the rule's 30-day limit had expired, and thus "RKO's candor cannot be faulted because it failed to duplicate that filing." RKO Brief at 39. The argument is specious to a fault. When candor is the question, the actions of the intervenor can hardly be used to bear witness. Community's filing in no way diminished RKO's responsibility to be candid and forthcoming with the Commission, yet this omission by RKO even in the face of continual promptings by its competitors is symptomatic of RKO's attitude through early 1976
 
 
 [42]
 RKO argues, for example, that it was not required by contemporaneous FCC precedents to report the SEC investigation until it culminated in "formal charges" against General Tire. See Lake Erie Broadcasting Co., 33 F.C.C.2d 1009 (Rev.Bd.1972), which held that an investigation sparked by the accusations of outside complainants as opposed to official charges by a governmental agency did not require immediate notification of the FCC. Although the Commission has shifted away from this rule, e.g., Payne of Virginia, Inc., 66 F.C.C.2d 633 (1977), that case was decided subsequent to RKO's disclosure of the SEC investigation in May 1976. We need not decide, however, whether the SEC decision in February 1976 to upgrade its enforcement activities from a preliminary to a formal investigation should have been reported under Lake Erie. In the context of the facts described above, it defies reason to imply that SEC enforcement activities were immaterial to the pleadings and claims then pending before the FCC. RKO can be faulted not for failing to report marginally relevant accusations, but for failing to realize from the change in the SEC's enforcement activities that its earlier statements to the Commission had been grossly inadequate
 
 
 [43]
 See Decision P 202 ("in refusing to be more forthcoming, RKO adopted a posture consistent with General Tire's SEC defense strategy. General Tire was resisting SEC document and other enforcement demands at least into February 1976."). General Tire's Special Report admitted that the SEC's Division of Enforcement had sought particular information from the corporation on December 5, 1975, but that "(n)o substantively complete answer was ever given to the SEC letter" of that date. Special Report at 31, J.A. 1271. A second letter was sent by Enforcement on January 22, 1976, and SEC staff members met with General Tire representatives on February 3. At this meeting, General Tire's vice president and former general counsel made "(s)harp, sarcastic comments" and at one point "advised an Enforcement staff member against holding his breath while waiting for submission of additional material because 'you'll turn blue.' " Id. at 32, J.A. 1272
 
 
 [44]
 We also agree that the Commission properly refused to consider a General Tire stock spin-off proposal that would have passed RKO's stock through General Tire to that company's 45,000 shareholders. See note 45 infra. This proposal threatened to violate the FCC policy that "a licensee cannot act improperly in the broadcast field and, when challenged, simply sell his station at a profit or without a loss; if this were permitted, such a licensee would have little reason to obey the Act ...." Tidewater Teleradio, Inc., 24 Rad.Reg. (P&F) 653, 657 (1962); cf. Grayson-Enterprises, Inc., 79 F.C.C.2d 936, 938 (1980). Similarly, General Tire's assurances of remedial action did not deserve more weight than the Commission gave them, because "promises of future compliance made after apprehension have not been accorded much weight." Decision P 234. The ruling that RKO's misconduct outweighs any favorable evidence of WNAC's broadcast performance or other mitigating factors is, of course, properly within the Commission's discretion. See Decision PP 223-49
 
 
 [45]
 Community had contended since 1975 that General Tire and RKO attempted "to conceal, mislead and deceive" the FCC, corporate shareholders, and the public by failing to disclose material information pertaining to Community's allegations. Community Petition, supra note 8, at 5-6, J.A. 539-40. Community repeated that charge in its Supplement to the Reply, supra note 41, at 6-7, J.A. 683-84 ("the Commission must now seriously question the lack of good faith and candor of RKO.... RKO has failed to meet the minimal standards of candor, required of Commission licensees."). More than a year later, Community referred to RKO's "dissembling and lack of candor in this proceeding" and argued that lack of candor was "the darkest blot on RKO's record ...." Community Motion to Deny, September 13, 1977, at 2, 22, J.A. 737, 757. Community also reiterated this charge in its reply to RKO's Response, note 13 supra. Community Reply, December 16, 1977, J.A. 811
 The FCC also foreshadowed the candor issue in May 1977 when it denied General Tire's proposal to spin-off its RKO stock. The FCC cautioned that it had "not yet ruled on the merits of Community's petition to enlarge issues," RKO General, Inc. (WNAC-TV), 64 F.C.C.2d 713, 718 (1977), but its refusal to act on the proposal because of "the undesirable possibility of impeding the conduct of an adjudicatory proceeding" by eliminating "adversarial development of the facts," id. at 718, 719, must be considered notice to RKO of the seriousness of its situation.
 Indeed, in October 1977, RKO spent several pages answering the lack of candor charge. RKO Response, supra note 13, at 14-19, J.A. 785-90. In September 1979, when RKO responded to FCC Order 79-453, see note 17 supra, it made the same claims to the Commission that it has on this appeal, arguing that "the procedural context in which RKO's responses were made disproves Fidelity's claims that RKO has not been candid." RKO Response, September 24, 1979, at 56, J.A. 1183; see id. at 51-61, J.A. 1178-88. The FCC contends that these pleadings and other materials show that "RKO had far more actual notice than the typical designation order would provide." FCC Brief at 113 n.234.
 
 
 [46]
 The full transcript of the oral argument held before the Commission on July 18, 1979, is not in the record before us. Nevertheless, the pleadings submitted by RKO before that proceeding amply demonstrate RKO's opportunity to address any factual or legal issues concerning its lack of candor. See note 45 supra
 
 
 [47]
 Indeed, RKO's interpretation of Section 309 would create the possibility that an incorrigible applicant could prolong hearings indefinitely, as each instance of egregious conduct in one proceeding would require new designation and a subsequent proceeding. Renewal applicants have an obvious financial stake in delaying unfavorable resolutions of their applications as long as possible. RKO, for example, is still operating the stations involved in this case, pending resolution of this appeal. See Brief of Intervenor Multi-State Communications, Inc. at 35 ("the abundant 'due process' already accorded RKO has provided it with licenses (and income) for many more years than it should have had.")
 
 
 [48]
 We express no view, in light of the pending appeal of this FCC order, as to whether a separate proceeding is the appropriate format for the introduction of such evidence or whether the matter should be addressed in the context of license renewal proceedings. See New South Media Corp. v. FCC, 644 F.2d 37 (D.C. Cir. 1980). We do hold that it is appropriate to treat RKO's New York City and Los Angeles licenses in the same manner as the licenses for RKO's other thirteen stations
 
 
 [49]
 KHJ-TV in Los Angeles and WOR-TV in New York City stand in very different positions, although this may be a distinction without a difference. KHJ's license renewal was granted, subject only to the FCC finding on reciprocity in the Boston proceeding that we now reject. WOR's license renewal was held in abeyance pending the resolution of the Boston renewal. Cf. KFPW Broadcasting Co., 47 F.C.C.2d 1090 (1973), in which the Commission reversed denial of an application despite its earlier decision that renewal proceedings for the applicant's second station would be res judicata as to the application. The license renewal had been denied on character grounds, but the denial of the application was reversed because the licensee's misconduct occurred before the new station came on the air. Id. at 1095-96