**DOUBLEDAY BROADCASTING COMPANY, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Metroplex Communications of Missouri, Inc., KSLQ, Inc., Intervenor.**

**No. 79–1670.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 13, 1980.
Decided June 26, 1981.

John W. King, Washington, D. C., with whom Michael H. Bader, Washington, D. C., was on the brief, for appellant.

Jane E. Mago, Counsel, F. C. C., Washington, D. C., for appellee.

Daniel M. Armstrong, Associate Gen. Counsel, Keith H. Fagan, and Roberta L. Cook, Counsel, F. C. C., Washington, D. C., were on the brief, for appellee. Robert A. Bruce, Counsel, F. C. C., Washington, D. C., also entered an appearance for appellee.

Martin R. Leader, Washington, D. C., also entered an appearance for intervenor, Metroplex Communications of Missouri.

Edgar W. Holtz and Richard S. Rodin, Washington, D. C., also entered an appearance for intervenor, KSLQ, Inc.

Before TAMM, ROBB and MIKVA, Circuit Judges.

Opinion for the court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This is an appeal by Doubleday Broadcasting Company, Inc., pursuant to 47 U.S.C. § 402(b) (1976), from a decision of the Federal Communications Commission that denied Doubleday's request to conform the call sign of Doubleday's FM station WGNU–FM licensed to Granite City, Illinois, with the call sign of its AM station KWK licensed to St. Louis, Missouri. The Commission concluded: (1) that Granite City, Illinois and St. Louis, Missouri, one and one-third miles apart and separated by the Mississippi River and a land area, were not "adjoining" communities as required by the Commission's rule governing conforming call signs; and (2) that in view of the potential for public confusion as to station location which conforming call signs would create, there was no public interest justification for departing from the rule in this instance. *Doubleday Broadcasting Co., Inc.,* FCC 79–361 (June 22, 1979) (J.A. 1).

The Commission is authorized by 47 U.S.C. § 303(*o*) (1976) to designate the call letters of radio devices under Title III of the Communications Act, 47 U.S.C. § 301 *et seq.* (1976). In the case of AM, FM, and television broadcast stations, Commission rules permit licensees to apply for the call sign of their choice, *see* 47 C.F.R. § 73.-3550(j) (1980),[1] subject however to certain limitations designed to standardize such choices to some degree[2] and to avoid public confusion regarding station ownership and location.[3]

---

1. At the time of the Commission's *Order,* the Commission's rules governing call sign assignments were designated section 1.550 *et seq.,* 47 C.F.R. § 1.550 *et seq.* (1978). These rules have since been redesignated as section 73.3550 *et seq.,* 47 C.F.R. § 73.3550 *et seq.,* (1980). *See* Deregulation of Radio and TV Broadcasting, 44 Fed.Reg. 38481, 38498 (1979).

2. *See, e. g.,* 47 C.F.R. § 73.3550(i) (1980) (requiring all call signs to have four letters except

that a new or acquired station may be conformed, subject to the other provisions of section 73.3550, to a commonly owned station holding a three-letter call sign assignment).

3. *See, e. g.,* 47 C.F.R. § 73.3550(j) (1980) (requiring call signs to be sufficiently dissimilar phonetically and rhythmically from existing call signs of stations in the same service area so that there will be no significant likelihood of public confusion).

One such limiting rule, at issue in this case, governs the issuance of conforming call signs to stations in different broadcast service areas. Adopted in 1973 as part of a comprehensive revision of Commission rules governing the assignment of call signs, *see Report and Order in Docket* 17477, 41 FCC 2d 481 (1973), this rule, section 73.3550(1), 47 C.F.R. § 73.3550(1) (1980) (formerly 47 C.F.R. § 1.550(i) (1978)), permits such stations to request the same call sign if they meet two basic qualifications: (1) they are commonly owned; and (2) they are licensed to "the same or adjoining communities." The Commission adopted this rule based on its finding that the use of conforming call signs, unless in the same or adjoining communities, unnecessarily confuses the public as to station location. *Report and Order in Docket* 17477, 41 FCC 2d at 483.

On November 16, 1978 Doubleday, the proposed assignee of the license of Station WGNU-FM, Granite City, Illinois,[4] filed a letter application with the Commission requesting that the WGNU-FM call sign of the Granite City station be changed to KWK-FM to conform it with the call sign of AM Station KWK, already owned by Doubleday and licensed to St. Louis, Missouri. (J.A. 4) Doubleday stated in its letter that its request was consistent with section 73.3550(1) (then section 1.550(i)) of the Commission's rule governing conforming call signs "since Granite City adjoins St. Louis." (J.A. 4)

Objections to the requested call sign assignment were filed by four licensees of broadcasting stations assigned to the St. Louis area.[5] The gravamen of all four objections was that St. Louis and Granite City are not "adjoining" communities as contemplated by section 73.3550(1). (J.A. 6, 15, 18, 23) "Adjoining", they averred, means being in actual contact, touching or bounding at a point or line. (J.A. 6, 18) St. Louis and Granite City, they said, are one and one-third miles apart, separated by the Mississippi River and certain land areas. (J.A. 1, 6, 15, 18, 23) In its reply, Doubleday contended that Granite City's close proximity to St. Louis was sufficient to qualify it as "adjoining" under the Commission's rule, as interpreted and applied by the Commission, notwithstanding that the two communities did not actually touch. (J.A. 31–33)

A request to conform call signs under 47 C.F.R. § 73.3550 is not unusual when two or more stations are commonly owned and are located in the same or adjoining communities.[6] Although most requests to conform call signs go unchallenged, the Doubleday request, as we have said, was met with four opposition pleadings. The objections are (1) that St. Louis and Granite City are not "adjoining communities" as defined in *Southwestern Broadcasting Corp.*, —— FCC2d ——, 38 Rad.Reg.2d (P&F) 39, 40 (1976), where the Commission held that " 'adjoining' is understood to mean 'contiguous,' i. e., in actual contact or very close by dictionary definition"; and (2) that the conformance would violate the W/east and K/west call sign rule. 47 C.F.R. § 73.3550(h) (1980). To these objections Doubleday responds that although the cities are not physically adjoining "Granite City's

---

4. An application for Commission consent to assignment of the FM station license to Doubleday was filed November 15, 1978 and was granted by the Commission January 31, 1979. Because WGNU-FM was no longer under common ownership with AM station WGNU, Granite City, Illinois, the Commission on March 17, 1979 authorized on a temporary basis the use of the call letters WWWK for the FM facility.

5. These broadcast licensees included KSD/KSD-TV, Inc., licensee of Station KSD and KSD-TV, St. Louis, Missouri; Saint Louis County Broadcasting Company, Inc., licensee of Station KKOJ, Clayton, Missouri; Metroplex Communications of Missouri, Inc., licensee of

Station KEZK-FM, St. Louis, Missouri; and KSLQ, Inc., licensee of station KSLQ, St. Louis, Missouri. Metroplex and KSLQ, Inc., are intervenors in this appeal.

6. *E. g.*: In the Washington area, WMAL, WMAL-FM and WMAL-TV were all commonly owned until new ownership changed WMAL-TV to WJLA and WMAL-FM became WRQX-FM; but WGMS-AM (Bethesda, Md.) and WGMS-FM (Washington), and WGAY-AM (Silver Spring, Md.) and WGAY-FM (Washington) illustrate call sign conformances, cases of common ownership and adjoining communities (physically touching).

close proximity to St. Louis, in the absence of actual contiguity, nonetheless qualifies it as an adjoining community under the call sign regulation." (Br. for Doubleday at 7) The company argues that the adjoining communities requirement was adopted to preclude call sign conformances between widely separated stations, as in *Eastern Oklahoma Television Co., Inc.*, 28 FCC2d 31 (1971), where the conformance was denied for stations in communities 45 miles apart. The Commission and the objecting stations rely on the Commission's ruling in *Southwestern Broadcasting* and *Eastern Oklahoma*.

In the *Eastern Oklahoma* case, *supra*, the adjoining communities requirement was applied to broadcast properties in two southeast Oklahoma communities: Ada, 65 miles southeast of Oklahoma City, and Atoka, 45 miles southeast of Ada. It was clear that Ada and Atoka did not adjoin nor were they even in "very close" proximity, but the licensee argued that the stations had substantially the same service areas and that the wide distribution of small communities in the southeastern part of the state constituted a "zone of inter-dependency" that should be viewed by the Commission as a "single, homogenous unit." 28 FCC2d at 31. The Commission found that not only are Ada and Atoka "separated by about 45 miles, [t]hey are not even in contiguous counties, and therefore can hardly be characterized as 'adjoining.'" *Id.* at 32. The Commission also rejected the homogenous unit service area argument by concluding that the stations did not serve substantially the same areas and populations.

Two years later the Commission addressed the conformance issue in its amendment of the call sign assignment rule, and declined "to relax existing requirements for the issuance of conforming call signs, i. e.,

that qualifying stations be under common control . . . and be assigned to the same or adjoining communities." *Report and Order in Docket No.* 17477, 41 FCC2d 481, 483 (1973) (Assignment of Call Signs, § 1.550(i)). Rejecting the use of Standard Metropolitan Statistical Areas (SMSA's) "or like standards" as a substitute for the "same or adjoining communities," the Commission cited *Eastern Oklahoma* and reaffirmed the requirement that the communities be "adjoining". 41 FCC2d at 483.

In the *Southwestern Broadcasting Corp.* case, 38 Rad.Reg.2d (P&F) 39 (1976) a request to conform an AM call sign to an FM facility in Puerto Rico presented the Commission with the opportunity to review the amended rule. The communities involved were separated by six miles; the Commission denied the request, ruling that "adjoining" means "contiguous". 38 Rad.Reg.2d (P&F) at 40. The Commission reiterated that the reason for the strict application of the rule was the "avoidance of public confusion as to station location," and it further defined "adjoining" to mean "in actual contact or very close, by dictionary definition." *Id.*[7] The Commission found that although the two stations served substantial areas in common, a divergence of those service areas created a potential for public confusion as to station location. The decision was based primarily on a finding that the pueblos (towns) where the stations are located are six miles apart and therefore ineligible under a strict geographic application of the conformance rule. The petitioners urged the Commission to accept the adjoining municipios (counties of the same names as the pueblos) as consistent with the rule[8] but the Commission found that "[c]ounties [municipios], as such, are geographically too extensive to qualify as licensed communities for broadcast stations . . . ." 38 Rad. Reg.2d (P&F) at 41 n.1.

---

7. Webster's Third New Int'l Dictionary 492 (Unabridged, 1976) defines "contiguous" as "touching along boundaries often for considerable distances; next or adjoining with nothing similar intervening; nearby, close; touching or connected throughout". Likewise, "adjoining" is defined as "touching or bounding at some point or on some line; near in space", *id.* at 27.

8. Puerto Rico is made up of 76 municipalities that contain one pueblo (town) that is the seat of government and, in most cases, has the same name as the municipio. The balance of the municipio is divided into barrios (suburbs). By U. S. census definition a municipio corresponds to a U. S. county *Southwest Broadcasting, id.* at 40.

Reading the *Eastern Oklahoma* and *Southwestern Broadcasting* cases together we learn that "adjoining communities" must be closer than 45 miles apart; in fact, closer than 6 miles; but we are not told just how close "very close" is when the phrase is used to define "adjoining", as it was in the *Southwestern Broadcasting* case. *Id.* at 40. We are somewhat enlightened by the Commission's attempted explanation of its order in the *Doubleday* case:

> Where, as here, the factual situation *does not precisely meet the nearness criteria* . . . we are required to evaluate *all relevant local circumstances* in determining whether favorable action on the proposal would be in the public interest. (J.A. 2) [Emphasis added]

For further enlightenment we turn to the case of KDWB–AM, St. Paul, Minnesota, and KDWB–FM, Richfield, Minnesota, and the case of KSGM–AM, St. Genevieve, Missouri and KSGM–FM, Chester, Illinois.

KDWB–AM, St. Paul, Minnesota, is the Doubleday "flagship" station for a Doubleday acquisition WYOO–FM in Richfield, Minnesota. A call sign conformance of WYOO–FM in Richfield to KDWB–FM was granted. The two St. Paul area stations are on opposite sides of the Mississippi River and Richfield in no way adjoins, touches, or borders upon St. Paul; in fact the communities are over 2.5 miles apart and separated by the Minneapolis-St. Paul Airport and the Fort Snelling Military Reservation in addition to the river. Notwithstanding these factors that seemingly would preclude conformance, the Commission found there was not sufficient likelihood of public confusion as to station location to prevent the grant of conformance requested by Doubleday; and this was so even though conformance required a change of the longstanding

"W" call sign—WYOO, as Richfield is east of the river—to a "K" designation— KDWB–FM. The Commission rules provide:

> Call signs beginning with the letter "K" will not be assigned to stations located east of the Mississippi River, nor will call signs beginning with the letter "W" be assigned to stations located west of the Mississippi River, except where necessary to conform the call sign assignment of stations which otherwise qualify for common call signs.

47 C.F.R. § 73.3550(h) (1980). Thus the "W" and "K" distinction between stations east and west of the Mississippi River is overcome whenever the Commission determines that an exception is necessary to conform call signs that "*otherwise qualify* . . ." 47 C.F.R. § 73.3550(h) (1980). [Emphasis added] Moreover, just as WWWK is allowed by the Commission to identify itself hourly as a "Granite City-St. Louis" station, so too is KDWB–FM allowed to identify itself as a "Richfield-Minneapolis-St. Paul" station.

The Commission granted a conformance for stations in St. Genevieve, Missouri (KSGM–AM), and Chester, Illinois (KSGM–FM), although the two towns are on opposite sides of the Mississippi River and neither adjoin nor face each other; Chester is about ten miles down river from St. Genevieve. Also, Chester and St. Genevieve are in different states and by their geographical locations violate the "W" and "K" call sign rule.[9]

If the Commission bases its denial of the St. Louis conformance request on a strict application of geographical boundaries then it is difficult to explain the outcome in the nearly identical St. Paul-Richfield situation.

---

9. In many other cases the Commission has granted requests to conform call signs of stations located in different states, or separated by water, or both. Thus Fargo, N.D. (KQWB) and Moorhead, Minn. (KQWB–FM) are separated by the Red River; Texarkana, Texas (KADO) and Texarkana, Arkansas (KADO–FM) are separated by the Texarkana River; Superior, Wisconsin (WAKX) and Duluth, Minnesota (WAKX–FM) are separated by the St. Louis Bay. Exceptions to the call sign rule within the same state include Troy (WTRY) and Albany, New York (WTRY–FM), separated by the Hudson River; Oakland (KABL) and San Francisco, California (KABL–FM), separated by the San Francisco Bay; and St. Petersburg (WLCY) and Tampa Bay, Florida (WLCY–FM), separated by the Tampa Bay. (Br. for Doubleday at 18 n.1, 19)

The only answer offered by the Commission is that there was no opposition to the St. Paul KDWB conformance in 1976, and the Commission looks more closely at contested requests: "Since Doubleday's request was not opposed in [the St. Paul case] it is perhaps not surprising that a busy agency failed to realize something that is retrospect, it probably should have perceived—*i. e.*, that Richfield and St. Paul do not in fact adjoin." (Comm'n Br. at 10 n. 13) At oral argument the Commission maintained that it is difficult to tell from a map what is included in purportedly adjoining areas, so that reliance on the applicant's representation is justified. Yet there is no mystery about what lies between St. Paul and Richfield, and what separates St. Louis and Granite City. In both cases a glance at a map plainly reveals the separation—geographic data perceived by the Commission only after the four opposition pleadings were filed in the St. Louis Doubleday case. What is also clear is that the Commission does not apply its strict geographic standard with any exactitude or consistency.

The only distinguishing factor advanced by the Commission for the St. Genevieve/Chester conformance is that the communities are of the same size (about 4,400 persons) while Granite City is a suburban community of about 40,000 and the population of St. Louis is 600,000. The Commission contends that considering all the relevant local circumstances the difference in the relative size of the communities "is sufficient to distinguish the Chester/St. Genevieve situation from the one presented here". (Comm'n Br. at 13 n.14) The rationale of the attempted distinction eludes us.

In the last analysis, the Commission's decision rests upon the conclusion, expressed in its memorandum opinion (J.A. 2), that a grant of Doubleday's request for conformance would result in public confusion. The Commission's explanation is:

> Since Granite City, Illinois is located east of the Mississippi River, Section 1.550(e) of the Rules [47 C.F.R. § 73.3550(h)] ordinarily proscribes assignment of call signs beginning with the letter "K" to such a station, unless it would otherwise qualify for conforming call signs. The risk of public confusion as to station location is heightened where, as here, we are asked to conform the basic call sign of the only full-time broadcast facility licensed to a suburban community in one state with a long-established station licensed to a central city in another state (St. Louis, Missouri). The people of Granite City (population 40,440) expect their stations to have "W" call signs. If the Granite City FM and St. Louis AM adopt a St. Louis basic call sign, the chances are too great that listeners will mistakenly believe that the Granite City FM is licensed to the St. Louis central city.

We think however that the Commission's reasoning will not withstand analysis.

In 1973, five years before Doubleday acquired Station WGNU–FM, the Commission authorized that station to identify itself on the air as "WGNU–FM, Granite City—St. Louis". The authorization stated "This action does not modify your existing license or affect your primary obligation to the community to which station WGNU–FM is assigned (Granite City). This letter or a photocopy thereof should be posted with the station license as evidence of dual-city identification authority." (Comm'n letter, January 26, 1973, Br. for Doubleday Addenda) Thus for five years before Doubleday acquired the station, WGNU, located in "a suburban community in one state" had been coupled with a "central city in another state", with the approval of the Commission. In these circumstances it would strain credulity to believe that a change from a "W" call sign to a "K" sign would cause listeners to think the location of the licensee had changed. In any event, as we have seen, the Commission in other almost identical cases has not found that change from "W" to "K" has produced public confusion.

The Commission contends in its brief (p. 10) that its decision in other cases "cannot serve as binding precedent" here. We do not understand the Commission's argument. If the Commission in other almost identical

cases has granted applications for conformance why should those cases not have precedential value? We think they do. We think further that by disregarding those precedents the Commission in this case has acted arbitrarily and capriciously. The Commission may not decide a case one way today and a substantially similar case another way tomorrow, without a more reasonable explanation than is offered here. Accordingly, the Commission's order is reversed.

*So ordered.*