BRACCO DIAGNOSTICS, INC., Plaintiff,

v.

Donna SHALALA, Secretary, United States Department of Health and Human Services, Michael Friedman, M.D., Lead Deputy Commissioner, Food and Drug Administration, and Food and Drug Administration, Defendants.

The DuPONT MERCK PHARMACEUTICAL COMPANY and Imarx Pharmaceutical Corp., Plaintiffs,

v.

Donna SHALALA, Secretary, United States Department of Health and Human Services, and Michael Friedman, M.D., Deputy Commissioner for Operations, Food and Drug Administration, Defendants.

SONUS PHARMACEUTICALS, INC., Plaintiff,

v.

FOOD AND DRUG ADMINISTRATION, Donna Shalala, Secretary, United States Department of Health and Human Services, and Michael Friedman, M.D., Lead Deputy Commissioner, Food and Drug Administration, Defendants.

Civil Action Nos. 97–0739(PLF), 97–0740(PLF) and 97–0742(PLF).

United States District Court, District of Columbia.

April 21, 1997.

Richard S. Morey, Kleinfeld, Kaplan and Becker, Washington, DC, for Bracco.

Nancy L. Buc, Buc & Beardsley, Washington, DC, for Sonus.

William W. Vodra, Arnold & Porter, Washington, DC, for DuPont.

Drake Cutini, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, DC, David M. Fox, Chief Counsel, U.S. Food and Drug Admin., Rockville, MD, for defendants.

Robert J. Shaughnessy, Williams & Connolly, Washington, DC, for defendant/intervenor Molecular Biosystems, Inc.

## ORDER

PAUL L. FRIEDMAN, District Judge.

Upon consideration of defendants' motion to dismiss the complaints in these consolidated actions pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, the memorandum in support thereof, the memoranda in support of plaintiffs' motions for preliminary injunction, the memorandum of Molecular Biosystems, Inc. and the oral arguments of counsel on the motions for preliminary injunction, and the Court having found that there is a substantial likelihood of plaintiffs' succeeding on the merits of this case, and the Court having further found that exclusive jurisdiction over the merits of this case does not rest in the court of ap-

peals, and the Court having also necessarily rejected plaintiffs' ripeness and exhaustion arguments, and for the further reasons set forth in its Opinion issued this same day, it is hereby

ORDERED that defendants' motion to dismiss is DENIED.

SO ORDERED.

### ORDER OF PRELIMINARY INJUNCTION

Upon consideration of the separate motions for preliminary injunction filed by the plaintiffs in the above-captioned · cases, the memorandum in opposition thereto filed by the defendants, the opposition filed by defendant-intervenor Molecular Biosystems, Inc., and the oral arguments made by counsel for the parties, it is hereby

ORDERED that defendants, their officers, agents and employees be and hereby are enjoined from continuing any approval or review procedures with respect to the Pre-Market Application submitted to the Food and Drug Administration by Molecular Biosystems, Inc. for its ultrasound contrast agent FS069 until ten days after the FDA resolves the merits of the Citizen Petitions filed by each of the plaintiffs in these actions or until further order of this Court; it is

FURTHER ORDERED that defendants, their officers, agents and employees be and hereby are enjoined from continuing any approval or review procedures with respect to plaintiffs' products, BR–1, DMP 115 and EchoGen, until ten days after the FDA resolves the merits of the Citizen Petitions filed by each of the plaintiffs in these actions or until further order of this Court; and it is

FURTHER ORDERED that plaintiffs shall submit security in accordance with Rule 65, Fed.R.Civ.P. The Court shall designate the amount of the security after the parties have filed supplemental briefs on that issue. The parties shall file their supplemental briefs by April 23, 1997; responses shall be due by noon on April 25, 1997.

SO ORDERED.

### OPINION

This matter is before the Court on plaintiffs' motions for preliminary injunction. Their motions are opposed by the Food and Drug Administration and the other defendants, as well as by their competitor, Molecular Biosystems, Inc., whom the Court has permitted to enter the case as a defendant-intervenor. The defendants have also moved to dismiss the complaints for lack of subject matter jurisdiction and for failure to state a claim. The Court heard extensive oral argument on April 18, 1997, and, upon consideration of the briefs filed by the parties and the arguments presented, it grants plaintiffs' motions for preliminary injunction.

### I.  BACKGROUND

The plaintiffs in these three consolidated cases are manufacturers of injectable contrast imaging agents for use with diagnostic ultrasound equipment in the diagnosis of cardiac dysfunction. Bracco's product is named BR–1; the DuPont Merck and ImaRx product is named DMP 115; and the SONUS product is named EchoGen. Each product contains fluorinated gas (perfluoropropane) encapsulated in a microsphere membrane or microbubble. Each is administered by intravenous injection into a patient's body in order to better reflect the sound waves used in ultrasound diagnostics, which in turn helps to improve the quality of the ultrasound images. After injection, the microbubbles eventually dissolve and the patient exhales the gas. *See* Bracco Mot. for Prelim. Inj., Declaration of Frank Didato at ¶ 2; DuPont Merck Mot. for Prelim. Inj., Declaration of Dr. Alan P. Carpenter at ¶¶ 12–16; SONUS Mot. for Prelim. Inj., Declaration of Dr. Steven Quay at ¶¶ 4–5. Plaintiffs' products are at various stages of review by the FDA, but none presently is approved for marketing.

Molecular Biosystems, Inc. has developed a virtually identical injectable microbubble ultrasound contrast imaging agent named FS069 (the successor to its already-approved product Albunex), which is also the subject of a pending application for approval by the FDA. MBI maintains that FS069 is significantly different from plaintiffs' products. It points out that EchoGen and DMP 115 re-

quire some type of agitation to create the microbubbles and that while some of the microbubbles in EchoGen are formed outside the patient's body *prior to injection by the action of pulling back the syringe*, more microbubbles are subsequently created inside the body as the heat from the patient's body vaporizes the suspension liquid to create gas bubbles. In contrast, the microbubbles in FSO69 are all formed during the manufacturing process, outside the human body; FSO69 is not dependent upon being metabolized for the achievement of its primary intended purposes. MBI Mem. in Opp'n, Declaration of Howard C. Dittrich, M.D. at ¶¶ 5, 6.

Plaintiffs argue that the only difference between their products and FSO69 is that the microbubbles in FSO69 are suspended in human albumin while the microbubbles in plaintiffs' products are suspended in a synthetic medium, a matter they say is of no significance. The declarations they have filed and an exhibit they submitted at oral argument (Exhibit 1), which is appended to this Opinion, demonstrate to the Court's satisfaction that the characteristics of all three of the plaintiffs' products and those of FSO69 are identical in all material respects. Indeed, on this point, the FDA has offered no counter-declarations or argument in response. The few differences noted in Dr. Dittrich's declaration submitted by MBI do not persuade the Court that all four products at issue are not virtually identical in their important characteristics.

Despite the similarity of the products, the FDA has chosen to regulate plaintiffs' products as new drugs and MBI's product as a

device.[1] Under the Federal Food, Drug and Cosmetic Act ("FFDCA"), there are separate provisions governing the regulation of drugs and devices, and the review provisions applicable to each differ in several respects. *Compare* 21 U.S.C. § 355 (regulating review and approval of new drugs) *with* 21 U.S.C. §§ 351(f), 360c, 360d, 360e (regulating classification, review and approval of devices). In addition, the FDA has established two distinct operating units or "Centers" to exercise the FDA's regulatory responsibilities: the Center for Drug Evaluation and Review ("CDER") is responsible for drugs; the Center for Devices and Radiological Health ("CDRH") is responsible for medical devices. 21 C.F.R. §§ 5.100, 5.32, 5.33, 5.59, 5.71, 5.72. Each has authority to approve products within its jurisdiction, but each Center is subject to direction by the Office of the Commissioner of the FDA.

The FDA has decided to treat MBI's product as a device and is treating plaintiffs' products as drugs; thus, both the CDER and the CDRH are regulating ultrasound contrast agents. The two Centers, however, apparently are applying very different standards to assess the safety and effectiveness of essentially identical products. Plaintiffs maintain, without contradiction, that they have been required to produce much more exhaustive scientific data demonstrating the safety and effectiveness of their ultrasound agents while MBI, in response to requests from the CDRH, has been required to submit much less rigorous information and testing results.[2] Plaintiffs argue that these dispa-

---

1. The Federal Food, Drug and Cosmetic Act ("FFDCA") defines "new drugs" as "articles intended *for use in the diagnosis, cure, mitigation,* treatment, or prevention of disease in man or other animals. . . . which [are] not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested." 21 U.S.C. §§ 321(g)(1)(B), 321(p)(1).

   The FFDCA defines a "device" as "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article . . . intended for use in the diagnosis of disease or other conditions . . . which *does not achieve its primary intended purpose through chemical action within or on the*

body . . . and which is not dependent upon being metabolized for the achievement of its primary intended purposes." 21 U.S.C. § 321(h). Devices are categorized as Class I, Class II, or Class III, depending on the degree of regulation necessary to ensure the safety and effectiveness of the device for its intended use. *See* 21 U.S.C. § 360c(a). Class III devices face the most stringent controls. *See* 21 U.S.C. § 360c(a)(1)(C).

2. The disparity in the review procedures imposed on plaintiffs' products compared to MBI's product were highlighted during oral argument by Plaintiff's Exhibit No. 2. Some of the differences are:

   (1) The CDRH permitted MBI to utilize a head-to-head clinical study with Albunex, MBI's predecessor product to FSO69, as the compara-

rate standards impose considerably greater financial and other burdens on those companies whose agents are being treated as drugs and regulated by the CDER than on MBI's product, treated as a device and regulated by the CDRH.

In January of 1982, the FDA issued a proposed rule relating to the classification of all radiological devices pursuant to the 1976 Medical Device Amendments to the FFDCA. 47 Fed.Reg. 4406 (Jan. 20, 1982). In its preamble, which constitutes an advisory opinion binding on the agency unless repudiated by the agency, *see* 21 C.F.R. § 10.85(d)(1), (e), the FDA stated: "The agency has determined that all radiologic contrast media, including barium enema kits, are to be regulated by FDA as drugs under section 201(g) of the act (21 U.S.C. 321(g)(1)) and not as devices." 47 Fed.Reg. 4406, 4412. Plaintiffs

argue that the FDA's review of MBI's precursor to FSO69, Albunex, and of FSO69 itself as devices rather than as drugs is directly contrary to this advisory opinion and, thus, unless fully and rationally explained, is arbitrary and capricious agency action in violation of the Administrative Procedure Act. Defendants and MBI respond that the advisory opinion had nothing whatsoever to do with products like plaintiffs' or MBI's and thus is of no moment in this litigation.[3]

In October 1987, the FDA approved the review of Albunex, manufactured by MBI, as a Class III device. MBI Mem. in Opp'n, Declaration of Howard C. Dittrich, M.D. at ¶ 3. Albunex was the first ultrasound contrasting agent to be regulated by the FDA as a Class III medical device and it is the so-called "first generation" product to which MBI's FSO69 is the successor.[4] After four

tor for efficacy, while the CDER required plaintiffs to verify the diagnosis made with their products and Albunex against a standard procedure such as cardioangiography or radionuclide ventriculography;

(2) With respect to DMP 115, the CDER required DuPont Merck to demonstrate the accuracy of its images in assessing cardiac function through clinical human trials. The CDRH, by contrast, allowed MBI to demonstrate the accuracy of FSO69 by performing a study on dogs.

(3) With respect to DMP 115, the CDER required DuPont Merck to conduct two safety and efficacy studies to demonstrate structure and function utility. The CDRH required MBI to conduct two safety and efficacy studies to demonstrate structure utility alone.

(4) With respect to DMP 115, the CIDER has instructed DuPont Merck that each of its clinical trials must have adequate statistical power to demonstrate reproducibility. The CDRH allowed MBI to pool data and it appears that no replication of results was required.

(5) The CDRH permitted MBI to conduct clinical studies in an open label fashion with the investigator, sponsor and patient aware of the contrast agent employed. By contrast, the CDER required plaintiffs' clinical studies to be conducted under blinded conditions where both the sponsor and the patient are blinded to the contrast agent administered in each case.

(6) With respect to the DuPont Merck product, DMP 115, the CDER required that a total of more than 500 subjects be exposed for safety testing while the CDRH only required that approximately 300 subjects be exposed for safety testing with respect to FSO69.

(7) While the CDRH only required MBI to evaluate patients at a single point in time at least 48 hours after administration of FSO69, the

CDER required plaintiffs to collect and submit follow-up safety data on patients evaluated at 24, 48, and 72 hour intervals post-administration.

(8) The CDRH did not require MBI to adhere to a weight-based dosing regimen in certain clinical trials, whereas the CDER required DuPont Merck to perform its clinical trials using weight-based dosing.

*See* DuPont Merck's Mot. for Prelim. Inj., Declaration of Alan P. Carpenter at ¶¶ 17–56; Plaintiffs' Ex. 2 (Submitted during oral argument April 18, 1997); *see also* Bracco's Mot. for Prelim. Inj., Declaration of Frank Didato at ¶ 6.

3. In his declaration, Roger H. Schneider, former Associate Director for Science of the CDRH states:

The preamble and the proposed regulation that it accompanied were part of the FDA's effort to carry out its statutory responsibility ... to classify all medical devices in commercial distribution before May 1976 into one of the three class established by the 1976 Act. As there were no ultrasonic contrast media in commercial distribution prior to May 1976, the preamble could not possibly have contemplated their classification or manner of regulation. ... The phrase "radiologic contrast media" in the preamble referred specifically to contrast media intended for use in x-ray radiographic imaging. ... which cannot have been intended, and cannot reasonably be read, to encompass contrast media used in connection with other imaging modalities.

MBI Mem. in Opp'n, Declaration of Roger H. Schneider at ¶¶ 4, 5.

4. The novel aspect of FSO69 compared to its precursor, Albunex, is the gas encapsulated in

years of review, the FDA approved Albunex as a device, making Albunex the first and only approved ultrasound contrast agent. The FDA publicly announced this approval on February 17, 1995. 60 Fed.Reg. 9334 (Feb. 17, 1995). Plaintiffs acknowledge that they were aware of Albunex's approval as a device, but Bracco argues that plaintiffs reasonably assumed that this approval was an anomaly, likely due to a "historical quirk" in the development of Albunex—it initially included medical instrumentation intended to be used by physicians to prepare the injectable suspension of air-filled microspheres prior to administration in patients. Bracco Mot. for Prelim. Inj. at 4 & n. 2.

In October 1992, SONUS recommended to the FDA that its product, EchoGen, be regulated as a drug, and the FDA product jurisdiction officer concurred by designating the CDER as the unit with primary review over EchoGen. *See* SONUS Mot. for Prelim. Inj., Ex. C, Letter from Amanda Pederson to Charles H. Davis (Dec. 17, 1992); Declaration of Dr. Steven C. Quay at ¶ 6. Bracco, allegedly relying on the FDA's policy of regulating ultrasound contrasting agents as drugs, *see supra* at 7 & n. 3, and its designation of EchoGen as a new drug, submitted an Investigational New Drug application ("IND") to the CDER for its product BR–1 on December 24, 1994.[5] ImaRx submitted an IND for DMP 115 to the CDER on August 8, 1995. On September 15, 1996, SONUS filed a New Drug Application ("NDA") for EchoGen.

Meanwhile, unbeknownst to plaintiffs, the FDA had been engaging in discussions with MBI about whether review responsibility for its products should be transferred from the CDRH to the CDER—in other words, whether the FDA should begin to treat MBI's products as drugs rather than as devices. MBI Mem. in Opp'n, Declaration of Howard C. Dittrich, M.D. at ¶ 3. MBI urged the FDA "to maintain in all respects the status quo," and "to insure that MBI's products continued to be regulated as medical devices assigned to CDRH." MBI Mem. in Opp'n, Ex. 5, Letter from Steven H. Unger, Deputy, Office of the Chief Mediator and Ombudsman, FDA to Kenneth C. Widder at 1 (March 29, 1996). The FDA ultimately agreed that "the principal review responsibility for Albunex and MBI's other microsphere contrast agents should remain in CDRH," and MBI was advised that both Albunex and FSO69 would "remain subject to review and regulation as medical devices." *Id.* at 2. Plaintiffs were unaware of the existence of this letter or of the decision that had been made until after the instant lawsuits had been filed.

By February 24, 1997, however, plaintiffs were aware that MBI had submitted its application for approval of FSO69 as a device and that the FDA had indicated it was satisfied with the studies performed by MBI to demonstrate the safety and efficacy of FSO69. Plaintiffs also were aware of the fact that the CDRH was the entity reviewing the Pre–Market Approval application for FSO69, submitted in October of 1996, although they were not aware that a final determination had been made that FSO69 would be reviewed as a device and approved, if at all, as a device.[6]

Beginning in the summer of 1996, Bracco. DuPont Merck and SONUS began discussions with the FDA in an effort to persuade the FDA to regulate ultrasound agents under uniform standards, be they as devices or as drugs. When the informal discussions were unsuccessful, each of the plaintiffs filed a Citizen Petition pursuant to FDA regulations. *See* 21 C.F.R. § 10.25. Bracco was the first to file its petition on December 27, 1996. Because the FDA has 180 days to respond to citizen petitions, see 21 C.F.R. § 10.30(e)(2), neither Bracco nor the other plaintiffs, who

---

the microspheres. Whereas Albunex utilizes sonicated air, FSO69 uses a perfluorocarbon gas that is similar to the gases used in the Bracco, SONUS and DuPont Merck/ImaRx products.

**5.** An IND allows a new drug manufacturer to conduct clinical trials on patients before submitting a New Drug Application, the application that

must be submitted prior to a new drug's ultimate approval. Defs.' Mem. in Opp'n at 8–9.

**6.** A Pre–Market Approval Application, or PMA, is the device approval counterpart to the NDA, the application for approval of a new drug. *Compare* 21 U.S.C. § 360e *with* 21 U.S.C. § 355.

filed their petitions later, have yet received responses.

In their petitions, plaintiffs requested the FDA to act promptly to eliminate the disparity in the regulation of ultrasound contrast agents and what they viewed as the "unjustified preferential treatment" given to MBI to the disadvantage of those whose products were being treated as drugs. *See* Bracco Mot. for Prelim. Inj., Exs. 3–5; DuPont Merck Mot. for Prelim. Inj., Ex. 1; SONUS Mot. for Prelim. Inj., Ex. G. They pointed out that the CDRH applies significantly different standards than the CDER to assess the safety and effectiveness of the agents even though the products are essentially identical. *Id.* Plaintiffs requested that the FDA determine that all ultrasound contrast agents be regulated under uniform standards and procedures either as new drugs or as medical devices. DuPont Merck asked for expedited consideration of its request, presumably because it knew that MBI's product was on track for approval by mid-April 1997. *See* DuPont Merck Mot. for Prelim. Inj., Ex. 1 at 1. DuPont Merck did not get expedited review, and all of the petitions remain pending.[7]

## II. DISCUSSION

### A. *Standards for Granting Emergency Injunctive Relief*

In deciding whether to grant emergency injunctive relief, the Court must consider (1) whether there is a substantial likelihood that plaintiffs will succeed on the merits of the case, (2) whether plaintiffs will suffer irreparable injury absent an injunction, (3) the harm to defendants or other interested parties, and (4) whether an injunction would be in the public interest or at least not be adverse to the public interest. *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir.1989); see *Washington Metro. Area Transit Comm'n v. Holiday Tours. Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977).

Plaintiff is not required to prevail on each of these factors. Rather, under *Holiday Tours*, the factors must be viewed as a continuum, with more of one factor compensating for less of another. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995). An injunction may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.* Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits. The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d at 843–45. In sum, an injunction may be issued "with either a high probability of success and some injury, or *vice versa.*" *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C.Cir.1985).

In this case, the Court finds that plaintiffs have a substantial likelihood of success on the merits with respect to their claim that by treating similar products differently the FDA has acted arbitrarily and capriciously in violation of the Administrative Procedure Act.

### B. *Likelihood of Success on the Merits*

Our court of appeals has repeatedly held that "an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Independent Petroleum Association of America v. Babbitt*, 92 F.3d 1248, 1258 (D.C.Cir.1996) (citing *National Association of Broadcasters v. FCC*, 740 F.2d 1190, 1201 (D.C.Cir.1984)); *see also Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C.Cir.1996); *Doubleday Broadcasting Co. v. FCC*, 655 F.2d 417, 423 (D.C.Cir.1981). "Government is at its most arbitrary when it treats similarly situated people differently." *Etelson v. Office of Personnel Management*, 684 F.2d 918, 926 (D.C.Cir.1982). As Judge Greene noted in a related context, "If an agency treats similarly

---

7. Plaintiffs also filed petitions for stay with the FDA. Bracco's and SONUS' petitions were denied; the FDA has not acted on DuPont Merck's petition for stay.

situated parties differently, its action is arbitrary and capricious in violation of the APA." *Allergan. Inc. v. Shalala,* 6 Food and Drug Rep. 389, 391, No. 94–1223 (D.D.C. Nov. 10, 1994) (Greene, J.).

In this case, the Bracco, DuPont Merck. SONUS and MBI products are identical in all material respects, and the FDA has not provided a legitimate reason for failing to regulate these similar products in the same way. Under the Administrative Procedure Act, the FDA either must provide a rational basis for treating MBI's imaging agent as a device while simultaneously regulating essentially identical agents as drugs, or it must treat all four of these similar products in the same way. A failure to do one of these two things is arbitrary and capricious agency action and therefore is a violation of the APA, 5 U.S.C. § 706(2)(A). *See Independent Petroleum Assoc. of America v. Babbitt,* 92 F.3d at 1258; *Transactive Corp. v. United States,* 91 F.3d at 237.

The MBI products and plaintiffs' products all likely meet both the definition of a drug and the definition of a device under the Federal Food, Drug and Cosmetic Act, and the FDA therefore has discretion in determining how to treat them. *See* 21 U.S.C. § 353(g) ("The Secretary shall designate a component of the Food and Drug Administration to regulate products that constitute a combination of a drug, device, or biological product.") What the FDA is not free to do, however, is to treat them dissimilarly and to permit two sets of similar products to run down two separate tracks, one more treacherous than the other, for no apparent reason. Plaintiffs merely maintain that the same tests and studies should be required of each product before it is approved and that that result is impossible so long as the FDA treats one as a device subject to the regimen established by the CDRH and the other three as drugs subject to the more rigorous regimen established by the CDER. The Court agrees. The disparate treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious. *See Independent Petroleum Assoc. of America v. Babbitt,* 92 F.3d at 1260; *Doubleday Broadcasting Co. v. FCC,* 655 F.2d at 423. Plaintiffs therefore are likely to succeed on this argument as a matter of law.[8]

In concluding that plaintiffs are likely to succeed on the merits, the Court necessarily accepts plaintiffs' characterization of the merits over defendants'. The issue in this case is whether the FDA policy of allowing similar ultrasound contrast agents to be regulated according to inconsistent standards and procedures is arbitrary, capricious, an abuse of discretion or unlawful. The issue is not, as defendants suggest, whether this Court has jurisdiction to review an agency decision not yet made to approve FSO69 as a medical device or to act in aid of that jurisdiction by entering an injunction. If it were, concededly the court of appeals, not this Court, would have jurisdiction. *See* 21 U.S.C. § 360g(a)(4); *Telecommunications Research and Action Center v. FCC,* 750 F.2d 70, 72, 78 (D.C.Cir.1984). In the absence of a clear congressional directive vesting jurisdiction over an APA challenge to the FDA's policies and procedures in the court of appeals, however, jurisdiction rests here. *See* 5 U.S.C. §§ 702, 706(2)(A).

### C. *Irreparable Harm*

Plaintiffs point to two primary sources of non-speculative, on-going and imminent harm. The first relates directly to the disparate treatment of their products and MBI's. They point out that they have had to undertake more difficult, time-consuming and expensive testing regarding the safety and effectiveness of their products than the testing required of MBI's product. Particularly because SONUS and Bracco are small companies, the time and person power spent, as well as the millions of dollars in costs, are indeed significant and irreparable losses. As plaintiffs point out, most of these costs in time and money would not have been imposed had their products been treated as medical devices to begin with. But plaintiffs

---

8. The Court is not persuaded that plaintiffs are likely to prevail on their second APA argument, namely, that in approving Albunex as a device the FDA changed a long-standing policy as reflected in its 1982 advisory opinion. *See supra* note 3.

were required to undertake additional studies even before they filed their applications, requiring them at the outset to spend more time and significantly more money than MBI was required to spend. "The usual development of a device takes less time than development as a drug. It requires fewer patients and less safety and efficacy data. This results in development cost savings and increased development speed." DuPont Merck Mot. for Prelim. Inj., Declaration of Mish Kara at 2. Plaintiffs' greater financial costs, which are on-going, can never be recouped.[9] While the injury to plaintiffs is "admittedly economic," there is "no adequate compensatory or other corrective relief" that can be provided at a later date, tipping the balance in favor of injunctive relief. *Hoffmann–La-roche Inc. v. Califano*, 453 F.Supp. 900, 903 (D.D.C.1978).

Plaintiffs will face a second form of imminent harm when the FDA acts on MBI's application later today—assuming it is approved. As pointed out by both SONUS' Steven C. Quay and MBI's Howard C. Dittrich, there is a significant economic advantage to receiving first approval and being the first company to enter the market, an advantage that can never be fully recouped through money damages or by "playing catch-up." *See* SONUS Mot. for Prelim. Inj., Declaration of Dr. Steven C. Quay at ¶¶ 10–12; MBI Mem. in Opp'n, Declaration of Howard C. Dittrich, M.D. at ¶ 2–3. As Judge Robertson recently noted, giving a pharmaceutical company's competitor "an officially sanctioned head start in the market" for a discrete pharmaceutical product will cause irreparable injury to the company that is left behind. *Mova Pharmaceutical Corp. v. Shalala*, 955 F.Supp. 128, 130–31 (D.D.C. 1997). *Cf. Allergan. Inc. v. Shalala*, 6 Food and Drug Rep. at 391 (concluding that "if a manufacturer of a product drops out of the market, its competitors are likely to gain

sales, probably in some measure in proportion to their market share," and that this sufficiently demonstrates irreparable harm). The Court concludes that plaintiffs have demonstrated irreparable injury.[10]

### D. *The Harm to Defendants Or Other Interested Parties*

■ MBI has made a strong argument, both in its memorandum of law and orally, that the injunction sought by plaintiffs—an injunction preventing the FDA from approving the pre-market application submitted by MBI for its ultrasound contrast agent FSO69 until such time as the Court rules on plaintiffs' requests for declaratory and permanent injunctive relief—would significantly harm MBI. MBI is a small company, a one product line company, that is counting on the approval of FSO69. MBI Mere. in Opp'n, Declaration of Howard C. Dittrich, M.D. at ¶ 2. It has devoted substantial time and money itself to the approval process for FSO69, and a delay in approval would have an injurious impact on MBI. Furthermore, MBI maintains that it relied in good faith on the decision of the FDA to treat its product as a medical device and that it should not now be penalized even if the FDA has treated the plaintiffs unfairly (a point that MBI does not concede). Finally, MBI points out that plaintiffs knew as early as February 17, 1995 that the FDA was treating Albunex, MBI's first generation product, as a medical device and plaintiffs sat on their rights without acting. Again, MBI says it should not be penalized in these circumstances. The Court is persuaded that MBI would be seriously harmed by the grant of an injunction.

### E. *The Public Interest*

■ Defendants and defendant–intervenor make strong arguments that the public interest favors permitting an agency to proceed with its administrative process without

---

9. For example, the rigorous testing requirements of the CDER has already resulted in at least $1.5 million in additional expenses for DuPont Merck. DuPont Merck Mot. for Prelim. Inj., Declaration of Dr. Alan P. Carpenter ¶ 21. SONUS reports to have spent over $700,000 on studies that the CDRH did not require of MBI and estimates that it has incurred clinical study cost increases due to the CDER requirements of more than $3,000,-

000 compared to PMA study requirements. SONUS Mot. for Prelim. Inj., Ex. G, Citizen Petition at 6 (Feb. 3, 1997).

10. The Court is not persuaded by plaintiffs' argument that they have suffered a constitutional violation or that a constitutional violation would constitute injury *per se* in this case.

interference and that there are public health reasons why FSO69 should be allowed to be marketed promptly after it has been thoroughly tested, passed all the tests and has been approved by the FDA. As plaintiffs point out, however, there is also a strong public interest in requiring an agency to act lawfully, consistent with its obligations under the APA, and to treat all similarly situated and regulated parties equally.

The FDA's "core function" is "[t]he promotion and protection of the public health." MBI Mem. in Opp'n, Ex. 7, Stmt. by Michael A. Friedman, M.D., Deputy Commissioner for Operations, FDA at 2 (February 27, 1997). If there is no rational basis for treating plaintiffs' and MBI's products differently, however, then an injectable ultrasound contrast agent may be released onto the market and used on cardiology patients after having passed less rigorous testing requirements than are required of every other ultrasound contrast agent currently under FDA review. Requiring the FDA to test similar products with the same scrutiny is consistent with the FDA's mission and is in the public interest. Requiring them to act lawfully is also very much in the public interest. Therefore, on balance, the Court concludes that the public interest is better served by issuing an injunction that will assure that the FDA meets its statutory obligations.

### F. Exhaustion of Administrative Remedies

Defendants argue that in view of the pendency of the Citizen Petitions that plaintiffs have filed with the FDA, and the fact that FDA regulations provide a procedural mechanism to petition the Commissioner "to take or refrain from taking any ... form of administrative action," 21 C.F.R. § 10.25, the Court would be acting prematurely by granting an injunction.

■■■ "Of 'paramount importance' to any exhaustion inquiry is congressional intent.... Where Congress specifically mandates, exhaustion is required.... But where Congress has not clearly required exhaustion, sound judicial discretion governs." McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992) (citations omitted). The FFDCA provides for administrative review of orders approving or denying New Drug Applications or Pre–Market Approval Applications. See 21 U.S.C. §§ 355(h), 360e(g). Plaintiffs, however, are not seeking this type of review because there are no NDA or PMA approvals or denials at issue in this case. Plaintiffs do seek relief of the disparate treatment to which they are currently subjected by the FDA, circumstances in which the FFDCA does not mandate administrative review. The Citizen Petition mechanism and its 180–day timeline is a creature of the FDA, not of Congress. Therefore, because Congress has not required exhaustion, "sound judicial discretion governs" the question whether to require exhaustion of remedies. McCarthy v. Madigan, 503 U.S. at 144, 152, 112 S.Ct. at 1085–86, 1090.

■■■ "The principle of exhaustion rests on the dual purposes of protecting administrative agency authority and promoting the economy of judicial resources." National Treasury Employees Union v. King, 961 F.2d 240, 243 (D.C.Cir.1992) (citing McCarthy v. Madigan, 503 U.S. 140, 145, 112 S.Ct. 1081, 1086–87, 117 L.Ed.2d 291 (1992)); see Public Citizen Health Research Group v. FDA, 740 F.2d 21, 29 (D.C.Cir.1984). Exhaustion of administrative remedies, however, is not a requirement that the courts apply rigidly; it is a "flexible doctrine." National Treasury Employees Union v. King, 961 F.2d at 243. There are, in general, "three broad sets of circumstances" in which federal courts may legitimately decline to require exhaustion. McCarthy v. Madigan, 503 U.S. at 146, 112 S.Ct. at 1087. Most relevant to the instant case is the exception to the exhaustion requirement that pertains when a plaintiff "may suffer irreparable harm if unable to secure immediate judicial consideration of [its] claim." Id. at 147, 112 S.Ct. at 1087. In such circumstances, a plaintiff need not await the conclusion of the administrative process. See National Treasury Employees Union v. King, 961 F.2d at 244. This appears to be just such a case.

The FDA regulations require the agency to respond to a Citizen Petition within 180 days of its receipt, see 21 C.F.R.

§ 10.30(e)(2), in Bracco's case, by the end of June 1997. The Court was advised during oral argument, however, that a "response" might consist only of a letter advising a petitioner that the agency needs more time to consider the matter. Forcing plaintiffs to await the FDA's response to their Citizen Petitions would permit the FDA to continue the disparate treatment of plaintiffs' products that is causing them to spend millions of dollars in testing fees and costs. More importantly, due to the apparently imminent approval of FSO69 as a device, see Bracco's Mot. for Prelim. Inj., Ex. 2, Transcript of Radiological Devices Panel Meeting at 35 (Feb. 24, 1997), the requirement of exhaustion would cause plaintiffs to wait while MBI gains first entry into the market with FSO69, giving it, in MBI's own words, a very "significant economic advantage." MBI Mem. in Opp'n, Declaration of Howard C. Dittrich, M.D. at ¶ 2. Meanwhile, plaintiffs would remain under the review jurisdiction of the CDER, subjected to more rigorous testing requirements than were imposed on MBI through the CDRH. Lacking a specific congressional mandate as to the plaintiffs' administrative remedy and finding plaintiffs faced with irreparable harm, the Court concludes that exhaustion of administrative remedies in the circumstances of this case is not required.

## III. CONCLUSION

The Court concludes that plaintiffs are likely to succeed on the merits of their APA claim that the FDA has failed to treat similarly situated products in the same fashion and that such conduct is arbitrary and capricious. The Court also concludes that the plaintiffs have suffered irreparable injury and will continue to suffer immediate and irreparable injury absent injunctive relief. Finally, the Court concludes that The public

interest is better served by the grant of a limited injunction to preserve the status quo pending a decision by the FDA as to how to treat all ultrasound contrast agents, whether as medical devices or as drugs, or to provide a rational explanation for its different treatment of the products at issue here.[11]

MBI argues that if the Court does grant injunctive relief it should truly preserve the status quo by placing constraints on the FDA with respect to all parties, not just with respect to MBI. Not surprisingly, plaintiffs oppose this suggestion, but MBI has the better argument. Plaintiffs told the Court at oral argument that they seek only to be treated the same way as MBI, subject to the same requirements and other procedures, *not* that all products necessarily should move through the process at the same pace; an earlier applicant or one with a more developed product or a better application, for example, might well be evaluated more quickly. Until uniform rules that will govern all are established, it is fair and equitable that the FDA not act with respect to any of the products at issue. *See United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586, 607–08, 77 S.Ct. 872, 884–85, 1 L.Ed.2d 1057 (1957); *Muskegon Piston Ring Co. v. Gulf of Western Industries, Inc.,* 328 F.2d 830, 831–32 (6th Cir.1964).[12] Accordingly, the Court will grant plaintiffs' motions for preliminary injunction and preserve the status quo by enjoining the FDA from approving FSO69 until ten days following the FDA's response to plaintiffs' Citizen Petitions, or until further order of the Court. The Court shall also enjoin the FDA from proceeding with any approval or review proceedings relating to any of plaintiffs' products until such time.

Orders consistent with this Opinion shall be issued this same day.

SO ORDERED.

11. The FDA could simply announce that all four products will be treated as drugs and reviewed by the CDER under its tests and procedures or that all four will be treated as devices reviewed by the CDRH. Alternatively, it could respond promptly to the plaintiffs' Citizen Petitions and provide a rationale for differential treatment after which the Court would be able to review that agency action and determine whether, while it does so, the injunction should remain in force or be vacated—that is, to reassess plaintiffs' likelihood of success on the merits in view of the FDA's reasons for its decisions.

12. The current status of plaintiffs' products is the following: SONUS has filed an NDA, which is still under review by the CDER; Bracco and DuPont Merck have filed INDs with the CDER, allowing them to conduct clinical trials on patients before submitting an NDA.

**Ultrasound Contrast Agents**

| CHARACTERISTIC | DMP 115 | ECHOGEN | BR–1 | FS069 |
|---|---|---|---|---|
| **Mechanism of Action:** <br> Reflection of Acoustical Energy | ✓ | ✓ | ✓ | ✓ |
| **Composition:** <br> Fluorocarbon Gas | ✓ | ✓ | ✓ | ✓ |
| **Description of Product:** <br> Microbubble Capsules | ✓ | ✓ | ✓ | ✓ |
| **Mode of Administration:** <br> Intravenous Injection | ✓ | ✓ | ✓ | ✓ |
| **Medical Applications Proposed:** | | | | |
| Left Ventricular Opacification | ✓ | ✓ | ✓ | ✓ |
| Endocardial Border Delineation | ✓ | ✓ | ✓ | ✓ |
| Left Ventricular Functional Assessment | ✓ | ✓ | ✓ | ✓ |
| **Questions Presented for FDA Approval:** | | | | |
| Is the diagnosis accurate? | ✓ | ✓ | ✓ | ✓ |
| Is it safe for humans? | ✓ | ✓ | ✓ | ✓ |

Based on information in the Citizen Petitions of Bracco Diagnostics, Inc., SONUS Pharmaceuticals, Inc., and The Dupont Merck Pharmaceutical Company. (FDA Docket Numbers CPI + CP2/96P–0511 and CPI/97P–0104.)